IVAN RANGE et al. v. TENNESSEE BURLEY TO-
BACCO GROWERS ASSOCIATION et al.
—298 S. W. (2d) 545.

Eastern Section. August 24, 1955.

Petition for Certiorari denied by Supreme Court September 4, 1956.

F. H. Parvin, Greeneville, for Ivan Range, et al.

W. E. Michael, Sweetwater, Walter B. Garland, Erwin, and L. S. Hulbert, Washington, D. C., for Tennessee Burley Tobacco Growers Ass'n., et al.

McAMIS, P. J. This suit was instituted by eleven members of Tennessee Burley Tobacco Growers Association, a cooperative association, incorporated under the laws of Tennessee against the Association and H. S. Duncan, its Secretary and General Manager, to stay alleged waste and to recover in behalf of complainants and "many hundred and thousands" of such growers for alleged waste already committed. A further purpose of the bill was to recover $563,000 representing the amount realized by the defendant Association from the sale of tobacco for the crop years 1946, 1947, 1948 and 1949 in excess of the amount borrowed from Commodity Credit Corporation to support the price of tobacco at 90% of parity on the auction markets of Tennessee.

The defendants answered the bill denying any acts of waste or mismanagement either past or prospective, asserting that the complainants named in the bill had no right to sue on behalf of other members or producers and that complainants actually represented certain segments of the tobacco industry, particularly warehousemen and redryers, described in the answer as monopolistic and desirous of forestalling threatened competition by wrecking the defendant Association. It was asserted that such interests were financing the suit and that the combined ''equities'' due complainants for the year 1946, for example, amount to only $84.28.

The answer admitted that, in order to better conserve the interests of its members, the defendant Association had constructed three storage warehouses and had a fourth under construction when the bill was filed. It was alleged that such acts are within its charter powers, constitute a proper exercise of such powers and, in no sense, amount to waste or an illegal diversion of corporate funds as alleged in the bill.

As to the excess of ''equities'' realized from the sale of tobacco acquired under the Federal support program the separate answer of the Association contains the following:

'' * * * When a tobacco crop is sold, under the sales policies approved by Commodity Credit Corporation, the amount of the non-recourse loan against that crop is required to be paid in full, together with interest. That has been done as to every crop that has been sold by this defendant. After that is done, the equities remaining on hand belong to the tobacco growers who had tobacco taken under loan. These tobacco growers, in almost

■■■■■■■■■■■

every instance, are members of the Association, and it has been, and is, the attitude of the Association, that these members can do what they please with their money. They can either have it paid back in cash, or they can retain it in the hands of the Association and apply it to any purpose which they conceive might be of advantage to the producers, and for the best interest of themselves and other tobacco producers.''

Although not emphasized in the pleadings the right to retain what will hereinafter be referred to as equities seems to have been presented to the Chancellor as turning on a proper interpretation of the following provision of annual contracts between Commodity Credit Corporation and the Association:

''All net gains accruing from the sale of tobacco upon which Commodity has loaned funds under this agreement shall be distributed on a fair and equitable basis to growers by the Association unless a disposition of such gains other than by distribution to such growers is requested by the Association and approved by Commodity.''

The Chancellor found that complainants had failed to establish waste or mismanagement but that the Association had no right to withhold equities from producers. The latter holding is predicated on a finding that the Association had represented to growers when they became members that such equities would be distributed in cash upon repayment of the loan to Commodity Credit Corporation for each crop year and that it would be inequitable to allow the Association to intermingle such funds with its revolving capital for the purpose of constructing a redrying plant as proposed. In that view it was not necessary to resolve any ambiguity in the above quoted provision of the contracts.

Accordingly, the Chancellor directed a reference to the Master to determine the amount due each producer who had sold tobacco during each of the years 1946, 1947, 1948, 1949 and (under an amendment to the bill) during the years 1950, 1951 and 1952. The Master was directed to report the amount due each producer and determine by correspondence which producers elected to withdraw the amount due.

From this decree both complainants and defendants have appealed. Complainants insist that the Court erred in finding that no waste had been committed or was being threatened and in not permanently enjoining defendants from using any of the equities due producers in the construction of permanent facilities for storing and redrying tobacco. The Association's primary insistence here, as in the Chancery Court, is that under its contracts with Commodity Credit Corporation it can use the equities due growers as a part of its revolving capital for any purpose germane to the functions and purposes of a cooperative enterprise without the consent of Commodity Credit Corporation. It is insisted that "distribution" as used in the contracts is to be interpreted as that term is understood in cooperative enterprises and as defined by the Internal Revenue Bureau in fixing liability for income taxes, as between such enterprises and their patrons, upon savings resulting from such operations. Both complainants and defendants complain of the action of the Chancellor in dividing the costs and in requiring members and producers to communicate to the Master by mail whether or not they elect to permit the Association to retain and use the equities due them. It is insisted that this method is unwise, impractical and unwarranted in law and the Association, as an additional ground for

reversing this action, insists in effect that complainants failed to establish a basis for maintaining their suits as a class action and that, at most, complainants should be permitted to recover only the equities due them as individual producers. If this latter insistence should be sustained, the reference would, of course, be limited to the amounts due complainants in their own right.

In addition to the construction of permanent facilities for the handling and storage of tobacco and the purchase of machinery, bookkeeping equipment and the like, complainants insist that excessive amounts have been expended in employing auditors and attorneys, per diem allowances and expenses of officers and directors, conducting an educational program designed to inform members of operations of the Association relative to growing, processing and marketing tobacco and in various other ways expending funds of the Association. In developing their insistence as to alleged waste, complainants in their proof have gone into great detail and conducted the most minute inquiry into such matters as the expense of dinner meetings and tips to waitresses at such meetings, the expenditure of a few dollars for a small present to the wife of the President of the Association, traveling expenses of the wife of the Manager on two or three occasions and the employment of unnecessary help on warehouse floors at times when no tobacco was being handled by the Association.

We find that the construction of permanent facilities and the purchase of machinery and equipment was approved by the duly elected Board of Directors of the Association in furtherance of its corporate purpose. Dinner meetings were held to discuss affairs of the Association

as customary in such organizations. The undisputed
evidence shows that an audit of the books and records re-
vealed no dishonesty in the handling of funds of the As-
sociation.

■ In the absence of fraud or corruption or ultra
vires activities, not here shown, the intrusion of a court
of equity into the internal affairs of a corporation is
generally not warranted. The stockholders have their
remedy within the corporation if it engages in activities
or pursues policies deemed inimical to the interests of
stockholders.

"The majority stockholders of a corporation have an
undisputable right, in the absence of fraud, to manage
the corporate affairs within the powers possessed by
such corporation, and courts of equity will not, as a gen-
eral rule, exercise jurisdiction at the instance of share-
holders in a corporation to control or interfere in the
management of the corporate or internal affairs of the
corporation. They have no power to interpose their
authority for the purpose of adjusting controversies
that have arisen among the shareholders or directors of
a corporation relative to the proper mode of conducting
the corporate business as they may have in case of a sim-
ilar controversy arising between the members of an
ordinary partnership. Mere errors of judgment on the
part of the officers or majority stockholders are not suffi-
cient as grounds for the interference of equity at the
instance of minority stockholders. The breach of duty
by a corporation, authorizing equitable relief by a share-
holder, does not refer to mere mismanagement or neglect
of the officers or directors in the conduct of the corporate
business. The courts do not interfere on these grounds;

to authorize or to justify interference, there must be actual or threatened injurious acts ultra vires, fraudulent and injurious practices, abuse of power, or oppression on the part of the corporation or its officers which are clearly subversive of the rights of the minority or of a stockholder and which, without such suits, would leave him remediless.'' 13 Am. Jur. 498, Corporations sec. 452.

Moreover, unless it appears that to do so would be an idle ceremony, stockholders cannot sue the corporation or its officers for the purpose of remedying wrongs alleged to have been committed without first having applied to the directors to interfere and have such wrongs abated. Boyd v. Sims, 87 Tenn. 771, 11 S. W. 948; State v. Mitchell, 104 Tenn. 336, 58 S. W. 365; McCampbell v. Fountain Head R. Co., 111 Tenn. 55, 77 S. W. 1070; Peeler v. Luther, 175 Tenn. 454, 135 S. W. (2d) 926.

In this case complainants failed to invoke the action of the Board of Directors and we do not find circumstances excusing their failure to do so. The proof shows no more than a division of opinion among stockholders and directors with the majority prevailing.

If complainants are correct in their insistence that equities arising from the sale of tobacco belong to the individual growers the relation between growers and the Association is that of debtor and creditor. It is not alleged that the Association is insolvent and there is no proof that it is about to become so. In the absence of such proof we are unable to see how complainants, as creditors, have any right to invoke judicial action affecting the internal affairs of the corporation.

We have concurred with the Chancellor in holding that waste and mismanagement are not established by

the proof. We have further held that, in any event, complainants as stockholders have not invoked the action of the Board of Directors to abate any alleged wrongful or illegal conduct or to sue the officer responsible therefore in the name of the corporation and for that additional reason cannot maintain the present action as stockholders. It results that any right to maintain the present action must be limited to the right of complainants, if any, to recover in their status as creditors equities arising from the sale of tobacco. In the absence of a showing of insolvency, can they maintain a class action for the recovery of such equities? We think not for two reasons:

(1) The proof tends to show that a great majority of the 70,000 or more producers entitled to equities desire to leave them with the Association. As we understand, a resolution so providing passed at an annual meeting of the member stockholders. Similar resolutions were passed in county meetings and failed of passage in others. It is true any action taken at these meetings does not preclude individual members from asserting any property rights they may have to these equities. But to hold that complainants may maintain this suit for the benefit of members might well be contrary to their wishes. The bill states that 7,000 or more of the members had voted to empower a committee to employ counsel to bring this suit but there is no competent proof to sustain this allegation. (There is proof that one of the witnesses saw a list of names but whether they were producers is not shown.) Quite aside from this, however, each producer has his action unaffected by complainants and without relation to their claims. As shown by the answer above quoted, as well as by the proof, the Association admits that the producers own the equities subject only to its

right to use them temporarily as a part of its revolving capital. There is no reason to assume that if the courts reach a contrary conclusion a multiplicity of suits would be required due to refusal of the Association to pay on demand.

The situation is not unlike that involving depositors in a bank. A and B have deposits in Bank C which is solvent. Can A who wishes to sue for the amount due him maintain an action for B who wishes to leave his money in the Bank? Plainly, it could not be maintained that A could sue in a class action in such a situation.

(2) We think a court of equity should decline to entertain the present action as a class suit for the distinctly different reason that complainants are not in the true sense suing in behalf of other producers. Though complainants are shown to be entitled to equities, some are stockholders in warehouses while others are employees of warehouses. It is admitted that warehousemen who are not shown to be members are conducting this suit and have employed and under certain contingencies have agreed to pay complainants' counsel. It is apparent that a conflict of interests between the warehousemen and the Association is, at least, conceivable. In the absence of some compelling reason to the contrary, a court of equity, under such circumstances, should confine the recovery to the parties complainant.

"In cases to which the doctrine of representation applies, and one of a few parties are permitted to sue and defend on behalf of many, care must be taken that a party or parties to the record fairly represent the interest or right involved, so that it may be fully and honestly tried * * *." 39 Am. Jur. 922, Parties, sec. 48.

■ On the other hand, we cannot follow defendants' insistence that complainants should be repelled from suing for the amounts due them as individuals because some, though not all, of them are interested in other enterprises with conflicting economic interests or because such interests are financing the suit. In the enforcement of their individual claims complainants have a right to accept aid for whom they please so long as champerty is not apparent.

■ The question of the right of the Association to use the equities as revolving capital with which to conduct its charter functions must be resolved in the light of the intent of the Congress in creating Commodity Credit Corporation and providing it with funds to support the price of certain selected commodities, including tobacco.

The purpose of the creating act is set forth in sec. 714, Title 15, U. S. C. A., in part as follows:

"For the purpose of stabilizing, supporting, and protecting farm income and prices * * * there is created a body corporate to be known as Commodity Credit Corporation, which shall be an agency and instrumentality of the United States."

Title 15, sec. 714j provides:

"The Corporation may, in the conduct of its business, utilize on a contract or fee basis, committees or associations of producers, producer-owner and producer-controlled cooperative associations, and trade facilities."

Elsewhere the Act provides that the Corporation may enter into such contracts or agreements as may be necessary in the conduct of its affairs and that, with respect

to such contracts, State and local laws shall not be applicable.

In brief outline, Commodity Credit Corporation since its creation has been supporting the price of tobacco by entering into contracts with cooperative organizations in the field. It then advances funds through loans to such instrumentalities with which they go upon the market and purchase tobacco which failed to bring, according to grade, 90% of parity. These loans, in turn, are secured by sales certificates and, as specifically provided by the Act, such loans are non-recourse loans. As a result, no loss can be sustained by the agencies carrying out the support program. Such agencies however, may ultimately sell the tobacco pledged to Commodity Credit Corporation for more than the amount of the loan. The defendant Association has now entirely sold the tobacco acquired for the years 1946, 1947, 1948 and 1949 and, after paying its indebtedness to Commodity Credit Corporation, expenses and the producer one-half the excess realized from the sale of the 1946 crop, still has on hand approximately the sum of $563,000 mentioned at the outset of this opinion.

In 1950, the Association by action of its Board of Directors paid in cash to producers one-half the equities for the 1946 crop and allocated on its books the balance due each producer. No further payments in cash have been made for succeeding years but, for such years as have been closed out, distribution by allocation on the books of the Association rather than in cash has been followed.

The governing contract provision for each year here involved has been substantially the same as that above quoted. Mr. Duncan, Secretary-Treasurer and Manager

of the Association, testified that no request was ever made of Commodity Credit Corporation to distribute equities due producers by allocation rather than in cash but that he advised it by letter in 1950 or 1951 of the action taken as to the 1946 crop and that no objection was made to the retention of one-half the equities for that year.

The record reveals a consistent and continuous controversy over a period of years within Commodity Credit Corporation and within the Tobacco Branch of the Department of Agriculture as well as between the defendant Association and the Director of the Tobacco Branch, Mr. Thigpin, who appears to have taken the position that the words "in cash" should follow the word "distribution." Although refusing to add a provision requiring distribution in cash, the responsible officials of Commodity Credit Corporation and, on appeal, the Secretary of Agriculture who, it appears, exercises supreme revisory authority over any action of Commodity Credit Corporation, assiduously avoided any official ruling upon the proper interpretation of the term "distribution". Likewise, although it must have been generally known that a dispute was raging as to the meaning of the term, no effort was made to have the question put to rest by action of the Board of Directors of Commodity Credit Corporation. We can only assume that it was the intention of Commodity Credit Corporation and the Secretary of Agriculture to leave to the Courts the task of construing and applying the term. Certainly, if Commodity Credit Corporation had any clearly defined intent to require distribution in cash or, conversely, to permit the Association

to retain and use equities as a part of its revolving capital, apt phraseology could have been found to accomplish its purpose.

If the question of a proper construction of the contract is to be viewed as turning finally upon the intent of Congress in setting up a statutory scheme for the aid of producers or at least against the background of such intent, as we think it must be, we find no contemporaneous, consistent and well-defined construction by officials charged with implementing the program which would be of aid in arriving at a satisfactory conclusion.

The doctrine that, in the construction of statutes, weight will be given to administrative construction is subject to the limitation that the courts will give only such effect to such interpretations as they deem appropriate, depending upon whether or not the construction has been frequent, general, uniform and contemporaneous and seemingly in harmony with some plausible construction of an ambiguous statute. 42 Am. Jur. 401, 402, 403, Public Administrative Law, secs. 80, 81.

The legislative intent was to aid producers by securing for them at least 90% of parity for their products. In the case of tobacco the practice has been that the crop of each producer is graded by a Government agent according to quality and condition before it is offered for sale. In view of this practice of dealing with producers as individuals, it cannot be assumed that, because a grower is assured of receiving 90% of parity, it was intended that he is to be considered as having received the full value of his crop or that his property rights in any sum above parity would be, in any way, impaired. As demonstated by the sales of tobacco by the defendant Associa-

tion it was to be expected that in many cases the tobacco would eventually bring more than parity price. And, as we have seen, the Association concedes all of this except that it now claims the right to hold payment of equities in abeyance until they can be replaced by equities arising from the sale of subsequent crops.

We will not lightly ascribe to the Federal Government an intent to benefit third parties at the expense of the grower who is the prime beneficiary of the Act even though such third parties may be other producers. It is true the Association intends to withhold the benefits only temporarily until other crops furnish enough capital to replace that withheld for a given year. But there is no assurance that there will ever be such replacement capital and, as we understand, the Association is claiming the right to judge when enough capital is available for the purpose, that, in turn, to depend upon the developing need for permanent facilities deemed by the Association to be beneficial to growers. And this right is claimed not only as to growers who are members of the Association but as to producers who are not members.

Whether it is true, as insisted, that there are abuses in the industry which can be remedied only by the collective action of growers is not within our province to determine. Our duty is to determine the rights of growers to claim the benefits of the Act, leaving them free to decide for themselves whether the benefits will be greater by leaving the funds due them in the Association for the collective use of themselves and all other growers than by withdrawing them.

The contract is articulate as to what the Association is to receive for its service in carrying out the support

program. If additional benefits were to accrue to it, it must be assumed that they would have been spelled out in plain terms and not left in doubt.

Any right of the Association to infringe upon the rights of growers must derive either from the Federal Government which made possible the realization of a profit or from the grower whose crop the Association has sold. In our opinion it has not been able to trace its claim to either source. We think any grower reading the contract in advance of the sale of his crop would have concluded that "distribution" meant distribution in cash upon the liquidation of the crop for the year rather than allocation according to cooperative usage and custom upon the books of the Association. As to such grower's crop, under its contract with Commodity Credit Corporation the Association was to act as an agent of the Federal Government and not in its capacity as a cooperative serving the industry as a whole.

We are unable to see how a ruling of the Internal Revenue Bureau defining the term "distribution" for the purpose of fixing liability for income taxes on savings, as between a cooperative and its members, can have any bearing on the present controversy. As pointed out, the Association as an agent of the Federal Government was not acting as a cooperative. Nor was it acting for its members as such. Its obligation was to act for the benefit of growers without regard to whether they were members of the Association and, in fact, many growers were not members. Moreover, as we understand, the ruling of the Bureau upon which the Association relies was not enunciated until after many of the contracts had been executed and largely, if not entirely, performed.

We have no doubt that Commodity Credit Corporation, in furtherance of the purposes of the Act and under the terms of the contract, could have authorized the Association to do all that it now claims the right to do with the equities due growers. As yet, however, it has not been asked to grant the Association such rights and we cannot infer such a grant from the mere fact that it continued to appoint the Association from year to year and made no objection as to the allocation of one-half the 1946 equities when advised of that action in 1950 or 1951. As shown, knowing of the controversy, it avoided any official ruling on the question. The question was one of policy calling for action by the Board of Directors subject to approval by the Secretary of Agriculture and an intent to deprive the growers of rights otherwise due them should not be implied alone from the circumstances shown. The contract contemplates affirmative formal action in the form of a request by the Association and approval by Commodity Credit Corporation in the light of current needs and all relevant circumstances.

It is appropriate here to say that there was no prejudicial error in the refusal of the Chancellor to grant a rehearing to enable the Association to show by the Federal Register of 1954 that the then Secretary of Agriculture had ruled that "in cash" should not be inserted in contracts with Commodity Credit Corporation. If the Secretary intended to hold by this action that the Association may allocate the equities rather than pay them in cash, except as to claims of complainants as individuals which will now take the form of a judgment, we know of no reason why the Association may not yet request and obtain an official ruling from the Commodity

Credit Corporation and, if adverse, invoke the action of the Secretary.

■ If counsel are unable to agree, the cause will be remanded for the purpose of determining the amounts due complainants as individuals both under the original and amended bills. We find no basis for taxing the defendant Duncan personally with any part of the costs since no relief was granted as to him. We assume this was an inadvertence. By far the greater portion of the costs of suit was incurred by the attempt of complainants to show mismanagement and waste by the Association. We feel that the greater portion of this testimony was wholly irrelevant on that issue upon which complainants were unsuccessful, resulting in a record of nearly 3,000 pages of testimony. Three-fourths of the cost of $1,400 for making up the transcript will be taxed to complainants and one-fourth to defendant Association and sureties on the respective appeal bonds. Remaining cost of appeal and all costs of the Chancery Court as decreed by that court will be equally divided between complainants and the Association.

Hale and Howard, JJ., concur.

On Petition to Rehear.

McAMIS, P. J. By their respective petitions to rehear both parties complain of our holding that the relationship between producers and the Association is that of debtor and creditor.

Complainants insist that the equities due producers are held in trust by the Association and, for that reason, we erred in not sustaining the suit as a class action. The Association insists that the equities constitute savings

which, under cooperative practice, are subject to be withheld and used as revolving capital. Upon further reflection, we are constrained to adhere to our original conclusion that such equities constitute nothing more than an indebtedness of the Association:

 The contracts of the Association with Commodity Credit Corporation created the relationship of principal and agent between them—not between the Association and producers. Under these contracts the Association became obligated to perform certain duties in furtherance of the purpose of Commodity Credit Corporation and the intent of the Act to aid producers. Incident to the performance of its contractual duties, and without any contract or agreement with individual producers, the benefits of the Act, to the extent of the equities here involved, found their way into the hands of the Association. The producers, as the prime beneficiaries of the contracts between Commodity Credit Corporation and the Association, are, therefore, mere creditors of the Association. The fact that the Association was acting as an agent of Commodity Credit Corporation does not impress the funds in its hand with a trust in favor of growers.

But, if we are mistaken in this view and the relation is that of trustee and cestui que trust it would seem that if, as we have held, complainants are not in the true sense representative of other thousands of growers entitled to equities, the same reasons would exist for declining to entertain the suit as a class action.

We said in our original opinion that warehousemen having at least possible conflicting interests were active in the conduct of the suit and obligated to pay fees of

complainants' counsel. In part, the basis of our statement that this was "admitted" was the testimony of Mr. W. G. Vann, a warehouseman. (Copied in an unpublished portion of this opinion.)

There is other evidence of activity by the warehousemen, too long and involved to set out, tending to the same conclusion.

It may be true as insisted that warehousemen helped in the creation of the Association and that its continued existence is not altogether contrary to their interests. A conflict lies, however, in the fact that the Association favors cooperative warehouses and redrying plants and it must be remembered that a primary purpose of the bill was to enjoin the use of funds in such enterprises. We are, therefore, of opinion a court of equity should decline to entertain the suit as a class action especially when to do so would force the Association to operate under the cloud of a possible judgment so large as to seriously jeopardize its credit. Aside from this, we think producers who wish to withdraw their equities can do so with greater facility and at less expense by making demand upon the Association than by coming into court to formally claim the benefits of this suit.

We are content with the taxation of the cost of making up the transcript as directed in our former opinion. Complainants' petition to rehear is, accordingly, denied.

The Association's petition to rehear erroneously assumes that under our former opinion a cooperative cannot place savings due its members in a revolving fund and devote such savings to the operation and advancement of the cooperative enterprise. That question was not

presented once we concluded that, in acting under its contracts with Commodity Credit Corporation, the Association was not acting in the role of a cooperative but as an agent of Commodity Credit Corporation. For the reasons above set forth we hold that such equities are debts of the Association and, therefore, cannot be classed as ''savings.'' For the same reason marketing laws and agreements are inapplicable.

The Association's petition mistakenly assumes that we held that the Chancellor was correct in raising an estoppel against it. Having held that the equities constitute indebtedness of the Association rather than savings due members it was unnecessary to determine the correctness of the Chancellor's holding that the Association had represented to prospective members that their equities would be distributed in cash.

The foregoing determines in principle other questions raised by the Association's petition to rehear. It must, therefore, be denied.

Hale and Howard, JJ., concur.