**Stanley HOLDER, d/b/a Holder's Tobacco Warehouse, Plaintiff/Appellee,**

v.

**Billy M. CELSOR; Billy F. Celsor; E.J. Parker, Jr.; Robert N. Rickman; Lewis Beasley, Jr., and Hartsville Tobacco Board of Trade, Defendants/Appellants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 5, 1995.

Permission to Appeal Denied by Supreme Court Aug. 28, 1995.

Jacky O. Bellar, Carthage, Eddie Taylor, Donoho & Taylor, Hartsville, for appellee.

Charles W. Bone, Keith C. Dennen, Wyatt, Tarrant & Combs, Nashville, for appellants.

### *OPINION*

LEWIS, Judge.

Defendants/appellants appeal from the judgment of the trial court which made permanent a temporary injunction ordering defendants to recognize and allocate to plaintiff additional selling time for the 1992–93 tobacco season.

A brief procedural history of this case is as follows. On 21 September 1992, plaintiff Stanley Holder, d/b/a Holder's Tobacco Warehouse, filed a complaint and motion for temporary injunction, contesting his allocation of daily sales opportunity for the 1992–93 tobacco season by the defendant Hartsville Tobacco Board of Trade (Board). Plaintiff specifically alleged that unless the Board's allocation of daily sales opportunity was enjoined, he would suffer damages in excess of $100,000.00. On 21 October 1992 the trial court entered an order granting temporary injunction to the plaintiff and ordered that defendants make available to the plaintiff the daily sales opportunity for the 1992–93 tobacco season to which he claimed entitlement in his complaint. The trial court based its decision, in part, on the finding that the plaintiff complied with the Board's bylaws, although he presented a lease for a building, in order to show additional floor space, fourteen days after the deadline set forth in the bylaws. On 6 July 1994 the trial court entered a final order, finding that the "temporary injunction issued previously [was] ... made permanent as to the 1992–93 tobacco season." Defendants have appealed from that order.

The pertinent facts are as follows. The parties to this suit are involved in the tobacco auction warehouse business in Hartsville, Tennessee. Plaintiff owns and operates a tobacco auction warehouse firm in the Hartsville market known as Holder's Tobacco Warehouse. Defendants B.M. Celsor, B.F. Celsor, and Robert N. Rickman own and operate a second auction warehouse known as the Planter's Tobacco Warehouse, and E.J. Parker, Jr. and Lewis Beasley, Jr. own and operate a third auction warehouse known as the Hartsville Tobacco Warehouse. All three warehouse firms engage in the sale of burley tobacco at auction in the Hartsville market. Furthermore, each of the firms is a member of the defendant Hartsville Tobacco Board of Trade. Mr. Rickman served as president of the Board, and each of the firms had a representative on the Board.

The United States Department of Agriculture (USDA) regulates when tobacco may be sold and how much tobacco may be sold. The USDA determines each year the burley tobacco selling season by designating the date that sales at auction of tobacco may commence and the days after that date when tobacco may be sold. In 1992 the USDA proclaimed that 10 November 1992 was the date that tobacco warehouse firms in the United States could begin accepting tobacco from growers and preparing the tobacco for sale. The USDA order provided that the 1992 selling season would commence on 23 November 1992 and proceed for fifteen working days and then recess. That order further provided that the 1992 selling season would resume in January 1993 and continue until all tobacco in the United States was sold.

The USDA also limits the number of pounds of tobacco that may be sold at auction in the United States on each day of the selling season. The USDA allocates the amount of tobacco that each market may sell in the form of an allocation of daily sales opportunity. In 1991, the USDA allocated 641,418 pounds of daily sales opportunity to the Hartsville market. Therefore, the aggregate amount of tobacco sold by the three tobacco warehouse firms in the Hartsville market could not exceed that amount on any day. In 1991 the USDA changed the market of tobacco at the state level. In essence, the regulations changed the method of allocating sales to the local markets from floor space allocations to the average of pounds sold over the best three of the previous four years. The USDA, however, does not allocate, regulate, or otherwise become involved in the division of daily sales opportunity among the auction warehouse firms operating within any market. The board of trade or warehouse association for each market allocates the division of daily sales opportunity among each of the auction warehouse firms. In the Hartsville market, the Hartsville Board of Trade performs the allocation function.

The Hartsville Board of Trade allocated the sales opportunity among each of the warehouses using the amount of available warehouse floor space of each of the warehouse firms. The Board had used this method in the Hartsville market since the 1940s. On 16 September 1991 the plaintiff asked the Board to allocate sales opportunity using a performance criteria rather than the floor space criteria. Plaintiff alleges that by using the performance criteria, he should be allocated 17.34% of the Hartsville market. The Board, however, made its allocation of daily sales opportunity for the 1991 selling season based upon floor space as follows:

| | |
|---|---|
| Hartsville Tobacco Warehouse (Parker & Beasley) | 47.930% |
| Planter's Tobacco Warehouse (Celsor, Celsor & Rickman) | 47.928% |
| Holder's Tobacco Warehouse (Holder) | 4.142% |

On 11 November 1991, plaintiff informed the Board by letter that he had acquired by lease/purchase the Marlene Industries Building, which he alleged entitled him to 170,000 square feet of additional floor space. The Board denied the plaintiff's request for the additional floor space as being untimely, because his request was received fourteen days before the opening of the 1991 selling season. Holder then filed a complaint in the Circuit Court of Trousdale County requesting a mandatory temporary injunction. Plaintiff requested that the Board adopt a performance-based criteria or that the board reallocate daily sales opportunity based upon the plaintiff's acquisition of additional floor space. At the time of the hearing, the Board

did not have written bylaws containing dates or methods for the allocation of sales time among its members. At the conclusion of the hearing, the trial court denied the plaintiff's request for temporary injunction with respect to the 1991 selling season. This lawsuit was voluntarily dismissed on 28 September 1992 by the plaintiff. Therefore, this lawsuit is not involved in this appeal.

Subsequent to the hearing in the aforementioned lawsuit, the Board began to prepare written rules and regulations containing deadlines in the form of a formal charter as a nonprofit organization, written bylaws, and written minutes. In 1992, the Board successfully adopted the bylaws, which lies at the heart of this appeal.

During June 1992 the Board discussed and subsequently adopted the bylaws of the Board of Trade. On 18 June 1992 Mr. Rickman delivered copies of the proposed bylaws to the members of the Board. At a 22 June 1992 meeting, the members of the Board met, discussed the proposed bylaws, and suggested modifications; however, no action was taken on the bylaws. Also at that meeting, plaintiff delivered an application for allocation of his daily sales opportunity for the 1992 selling season to Mr. Rickman, which indicated floor space of 331,000 square feet at three separate locations, including the Marlene Industries Building. Plaintiff alleged that he had purchased the Marlene Building, and he now alleges that it was common knowledge that he had acquired the building in June 1992. Plaintiff moved at the 22 June meeting that he be allocated the 331,000 square feet under the old rules of the Board of Trade, but the motion failed for lack of a second.

On 25 June 1992, the Board convened and voted to adopt the Board's charter and bylaws. Plaintiff was not present at this meeting; he alleges he had no notice of the meeting.

The bylaws adopted by the Board codified its custom of allocating the market's daily sales opportunity among its members based upon the amount of warehouse floor space each member had available for tobacco auction. The bylaws provided that the Board must determine the total amount of qualified floor space in the market and make the allocation of daily sales opportunity, based upon the determination for the upcoming season at a regular meeting to be held on the first Tuesday of September each year. Qualified floor space is defined by the bylaws, section 10.04, as follows:

(a) interior floor space on the main floor of a building meeting the requirements of the United States Department of Agriculture for use as a tobacco auction sales floor; (b) owned or leased by the member or its affiliates for a period beginning no later than September 1 and extending through March 15 of each selling season; (c) for which proper application has been made and approval granted pursuant to these Bylaws.

Section 10.05 of the bylaws establishes a procedure for addition and qualification of floor space by existing or new members of the Board. That application procedure requires that a notice of intent be given no later than June 15 and that construction and all efforts to remedy deficiencies be completed by August 15.

Plaintiff applied for approval of the Marlene Industries Building as qualified floor space. The Board voted on 9 July 1992 to approve plaintiff's application for the Marlene Industries Building, contingent upon delivery of: (1) a letter from the USDA, or other proof, showing the space to be in conformity with USDA regulations and for the AMS to grade; and (2) a lease or proof of ownership of the Marlene Building. The Board had determined that delivery of these items must be received no later than 1 September 1992, because the Board would allocate daily sales opportunity on that date, as set forth in the bylaws. On 27 August 1992 plaintiff received notice of the regular meeting of the Hartsville Tobacco Board of Trade, to be held on the first Tuesday in September, in accordance with section 10.04 of the bylaws to allocate daily sales opportunity for the 1992 selling season. Attached to that notice was a report which included the fact that "to date, the Hartsville Tobacco Board of Trade has not received proof of ownership or leasing of the applied for selling space."

On 1 September 1992 the Hartsville Tobacco Board of Trade convened to determine the amount of "qualified floor space" in the Hartsville market and to make the allocation

of daily sales opportunity among its members for the 1992 selling season. At the 1 September 1992 meeting, all members of the Board were present. The Board received a report that 272,657 square feet in the Marlene Industries Building met the USDA's requirements. Plaintiff then submitted a copy of a contract of sale for commercial property to the Board. The Hartsville Board of Trade recessed to consider the contract of sale.

On 7 September 1992 the Board reconvened and determined that plaintiff had failed to provide proof of either ownership or lease of the Marlene Industries Building. The Board, thus, did not accept the contract of sale as such proof and did not allocate space to the plaintiff for the Marlene Building. The Board allocated the daily sales opportunity in the same proportions as the 1991 selling season.

On 14 September 1992 the plaintiff delivered a copy of a lease of the Marlene Industries Building to Mr. Rickman, president of the Board. The lease was dated as of 1 September 1992. Plaintiff requested that the Board convene to consider the lease the next day, but Mr. Rickman refused to convene the Board for that date.

Defendants state that "[t]his case involves one basic issue—the propriety of intervention by a court in the private affairs of a corporation in the absence of fraud, bad faith, corruption or other misconduct." The defendants contend that the Board of Trade promulgated bylaws applicable to each member and that the bylaws specified that the Board of Trade would allocate the daily sales opportunity for the Hartsville market on the first Tuesday of each September. The bylaws also stated that all applications to increase a member's share of the market must be completed and submitted by a date certain. That for the 1992 selling season the deadline was 1 September 1992. Defendants contend that the plaintiff failed to complete his application by that date and that he failed to present any evidence of ownership or lease of the Marlene Industries property by the date set. Defendants thus contend that plaintiff did not have an ownership or leasehold interest in the Marlene Industries

Building when the deadline expired. Finally, the defendants assert that "the [p]laintiff possessed the ability to satisfy that one requirement, but for his own reasons, elected not to do so."

The trial court specifically found that there was no evidence of fraud, bad faith, corruption, or other misconduct in the promulgation or application of the bylaws by the defendants. However, notwithstanding this finding the court found that the plaintiff had not complied with the Board of Trade's bylaws by presenting a lease for the Marlene Industries Building, fourteen days after the deadline. The court initially issued a mandatory temporary injunction, which ordered the defendants to recognize the Marlene Industries Building in the allocation of daily sales opportunity for the 1992–93 selling season. The court subsequently made the injunction permanent for the 1992–93 tobacco season.

■ It is a well-settled principle of law that the courts in Tennessee should not interfere in the affairs of an association or private corporation in the absence of proof of bad faith or fraud on the part of those intrusted with its management. *Tennessee Secondary School Athletic Ass'n v. Cox*, 221 Tenn. 164, 174, 425 S.W.2d 597, 601 (1968) (quoting 6 *Am.Jur.2d Associations and Clubs* § 27 (1964)). In *Tennessee Secondary School Athletic Ass'n v. Cox*, two high school students sought to challenge the rules of the Tennessee Secondary School Athletic Association (TSSAA) on transfer and eligibility. *TSSAA v. Cox*, 221 Tenn. at 165–68, 425 S.W.2d at 597–98. Those rules prohibited students who transferred from one high school to another from participating in athletics at their new school. *Id.* at 165, 425 S.W.2d at 598. Specifically, the bylaws of the association provided that a student could not transfer to another member high school without losing his athletic eligibility for a period of twelve months unless the association's board of control determined that the rule worked an undue hardship on the student. *Id.* at 165, 425 S.W.2d at 598. The bylaws also provided that requests for the consideration of such exceptions would be acted upon by the board of control only at its August and January meetings. *Id.* at 165, 425 S.W.2d at 598.

The facts showed that one of the students failed to apply to the association for a waiver of the eligibility rules until after the August

meeting of the board of control. *TSSAA v. Cox,* 221 Tenn. at 172, 425 S.W.2d at 600. The board refused to grant him a special hearing. *Id.* at 172, 425 S.W.2d at 600. The other student applied in time for a waiver of the eligibility rules; however, his application was denied. *Id.* at 173, 425 S.W.2d at 601. Both students sued the association alleging that the action of the association was harsh, arbitrary, unlawful, and caused them irreparable harm. *Id.* at 168, 425 S.W.2d at 598. The Chancellor granted their requests for temporary injunctions. *Id.* at 170, 425 S.W.2d at 599.

On appeal, our Supreme Court held that the trial court was without jurisdiction to grant the injunctions. *Id.* at 177, 425 S.W.2d at 602. The court stated that the issue was "whether the Chancery Court had jurisdiction to intervene in the internal affairs of the Association and enjoin the enforcement of its eligibility rules for the benefit of the individual complaints." *Id.* at 169, 425 S.W.2d at 599. The Supreme Court concluded there was no showing that the proceedings before the board of control were not pursuant to the rules of the association or were not conducted lawfully and in good faith. *Id.* at 173–74, 425 S.W.2d at 601. The court held that it was well established that "the courts will not interfere with the internal affairs of voluntary associations, except in such cases as fraud, lack of jurisdiction, or the invasion of property rights or interests." *Id.* at 174, 425 S.W.2d at 601 (quoting 6 *Am.Jur.2d, Associations and Clubs,* § 27 (1964).

> Where . . . by-laws infringe no public policy or rule of law and are not unreasonable, courts will never interfere to control their enforcement, but such corporations or associations will be left to enforce their rules and regulations in the manner they have adopted for their own government and methods of discipline.

*Id.* at 174, 425 S.W.2d at 601 (quoting *Peoria Comm'n Co. v. Memphis Merchants' Exchange,* 3 Tenn.C.C.A. 339 (1913)).

Tennessee courts have reaffirmed the holding in *Cox* that in absence of fraud, lack of jurisdiction, or the invasion of property rights, courts should not interfere with the internal affairs of voluntary associations. *See Wingad v. Tennessee Secondary School Athletic Ass'n,* No. 02A01–9111–CH00275, 1992 WL 213380 (Tenn.App. 4 Sept. 1992); *Campbell County Comprehensive High School v. Tennessee Secondary School Athletic Ass'n,* No. 36, 1988 WL 1749 (Tenn.App. 14 Jan. 1988);

The principles heretofore discussed have not been limited by our courts to voluntary associations or to the area of high school athletics. They have also been applied by this court in cases involving tobacco and tobacco warehouses. *Range v. Tennessee Burley Tobacco Growers Ass'n,* 41 Tenn.App. 667, 298 S.W.2d 545 (1955). *Range* involved a suit by members of the Tennessee Tobacco Growers Association, a cooperative association incorporated under the laws of this state, against the association and one of its officers. The plaintiffs wanted to stay waste allegedly being committed by the association. *Id.* at 670, 298 S.W.2d at 547. This court held that the plaintiffs had failed to establish waste by the association and noted that "[i]n the absence of fraud or corruption or ultra vires activities, . . . the intrusion of a court of equity into the internal affairs of a corporation is generally not warranted." *Id.* at 675, 298 S.W.2d at 549.

Furthermore, this court in *Payne v. Gauchat,* 61 Tenn.App. 722, 457 S.W.2d 853 (1970), held that a warehouse association has the right to enforce its written regulations or, in the absence of written regulations, the custom observed by the association upon its members without interference from the courts. *Id.* at 733–34, 457 S.W.2d at 858. In *Payne,* a member of the Clarksville Tobacco Market challenged the Clarksville Warehouse Association's refusal to recognize a transfer of sales opportunity from his warehouse, which had been destroyed by fire, to another warehouse. *Id.* at 723–25, 457 S.W.2d at 853–54. The evidence showed that the association had bylaws adopted in 1931 when no restrictions on daily sales existed. The bylaws therefore had no provision for allotments or poundage. *Id.* at 730, 457 S.W.2d at 856–57. The association adopted unwritten policies by a majority vote of its members, when it was necessary to maintain an orderly market or to satisfy governmental requirements. *Id.* at 733, 457 S.W.2d at 857. The basis of the association's refusal to recognize the transfer was one of those unwritten policies. The Chancellor upheld that re-

fusal noting that "[i]f the by-laws, rules and regulations specifically allowed or prohibited the sale of an allotment the Court would be bound thereby, and in the absence of such written specific rule, the custom and manner in which the membership has handled the allotments is equally binding on the Court." *Id.* at 733–34, 457 S.W.2d at 858.

In the instant case the trial court was not confronted with the unwritten customs adopted over many years of operations. Instead, the trial court was provided with written bylaws duly adopted by majority vote of the members and subsequently ratified by all members at the 7 July 1992 meeting, some fifty days before the 1 September deadline. The trial court found that the bylaws adopted by the Board of Trade applied and that the bylaws themselves were reasonable and not aimed or directed at any particular board member. The trial court also recognized the importance of the cut-off dates in the bylaws and held that the 1 September deadline contained in the bylaws was reasonable. However, the trial court did not apply those regulations as written. Instead, the trial court issued an injunction that was clearly in violation of the principles enunciated in the cases we have discussed.

We are of the opinion that the trial court was without jurisdiction to interfere into the actions of a private corporation, and it was error to issue the injunction.

It therefore results that the judgment of the trial court is reversed, and the cause is remanded to the trial court for further necessary proceedings. Costs on appeal are assessed to the plaintiff/appellee.

TODD, P.J. (M.S.), and ROBERT E. CORLEW, III, Special Judge, concur.