ERNEST F. BURKE, DANIEL NEWMAN, )
JOHN H. "TOMMY" KERKELES, KARL )
THOMPSON, STEVE BEECH, )
 )
    Plaintiffs/Appellants, )
 )    **Marshall County Chancery**
 )    **No. 9598**
VS. )
 )    **Appeal No.**
 )    **01A01-9611-CH-00511**
THE TENNESSEE WALKING HORSE )
BREEDERS' & EXHIBITORS' ASSOC. and )
PHIL SNODGRASS, C.L. BAIRD, SR., NEIKA )
WILLIAMS, JUDITH BURGESS, MARIETTA )
GAMBRELL, PAMELA REBAND, W. DAVID )
LANDRUM, JOYCE MORRIS, CHARLES )
CLEGHORN, CARROLL BENEDICT, )
ROBERT CHERRY, )
 )
    Defendants/Appellees. )

**FILED**

**May 28, 1997**

**Cecil W. Crowson
Appellate Court Clerk**

IN THE COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEAL FROM THE MARSHALL CHANCERY COURT
AT LEWISBURG, TENNESSEE

HONORABLE LEE RUSSELL, JUDGE

ROBERT G. WHEELER, JR., ESQ.
Lewis, King, Krieg, Waldrop & Catron, P.C.
P.O. Box 198615
Nashville, TN
ATTORNEY FOR PLAINTIFF/APPELLANT

DIANE M. SEGROVES, ESQ.
Bobo, Hunt & Bobo
P.O. 169
Shelbyville, TN
ATTORNEY FOR DEFENDANTS/APPELLEES

AFFIRMED AND REMANDED

HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

CONCURS:
SAMUEL L. LEWIS, JUDGE

CONCURS WITH RESULTS
WILLIAM C. KOCH, JR., JUDGE

ERNEST F. BURKE, DANIEL NEWMAN,       )
JOHN H. "TOMMY" KERKELES, KARL        )
THOMPSON, STEVE BEECH,                )
                                      )
    Plaintiffs/Appellants,          )
                                      )    **Marshall County Chancery**
                                      )    **No. 9598**
VS.                                   )
                                      )    **Appeal No.**
                                      )    **01A01-9611-CH-00511**
THE TENNESSEE WALKING HORSE           )
BREEDERS' & EXHIBITORS' ASSOC. and    )
PHIL SNODGRASS, C.L. BAIRD, SR., NEIKA )
WILLIAMS, JUDITH BURGESS, MARIETTA    )
GAMBRELL, PAMELA REBAND, W. DAVID     )
LANDRUM, JOYCE MORRIS, CHARLES        )
CLEGHORN, CARROLL BENEDICT,           )
ROBERT CHERRY,                        )
                                      )
    Defendants/Appellees.           )

# OPINION

The captioned plaintiff's have appealed from a summary judgment dismissing their suit to invalidate an election of a board of directors of Tennessee Walking Breeders and Exhibitor's Association and all actions of the Board selected in said election.

The second amended complaint asserts the following:

1.    The captioned plaintiffs are members of the captioned association. Burke, Kerkeles and Thompson are directors of the association. Burke is an unsuccessful candidate in the 1995 election of directors.

2.    The association is a Tennessee Corporation.

3.    Robert Cherry is the executive director of the association. All other defendants are members of the executive committee of the board of directors.

4.      The by-laws of the association are exhibited to the complaint.

5.      Article III of the by-laws provides for the election of directors not later than November 1 of each year to take office at the annual December membership meeting.

6.      Article III, Section 2 of the by-laws contains specific requirements for a valid election, including the following:

In-house Election Procedures Plan

A 12-member Election Committee will be appointed by the Executive Committee. Each Executive Committee member will appoint one Election Committee member, however, no more than four members from any given state will serve on the Committee. A TWHBEA member who is a candidate in the election may also serve on the Election Committee; however, that member shall not serve as Chairman of the Committee nor be allowed to count votes from his or her own state. The Executive Committee shall appoint the Chairman of the Election Committee from one of the 12 Election Committee appointees. The Election Committee will then be responsible for supervising, preparing and distributing election ballot packets and will be solely responsible for tabulating election results in accordance with the following procedures.

Step One: The ballot packet will include a letter explaining the election procedure with voter instructions included, a list of all 5-year members eligible for election, a ballot card and a postage-paid return envelope which will bear a label with the voter's membership number only. (Membership numbers, not names, shall be used to verify voters' eligibility.) Voting members shall be instructed to seal their completed ballot, unsigned, in the envelopes.

Different colored return envelopes shall be provided for larger voting states.

Step Two: The return envelope will be addressed to a post office box reserved by TWHBEA solely for election returns. *Ballotts shall be required to be in the Election Committee post office box by October 15.* All returned ballots will be picked up from the post office box on the day of results' tabulation (and not before that day), by two designated Election Committee members. The unopened ballots will be taken directly to the Election Committee meeting for tabulation. Any ballots found already open at the Election Committee meeting will be

-3-

considered ineligible for counting.

Step Three: All returned envelopes will be put in numerical order by membership number, and voters' numbers will be cross-checked against the list of eligible voting members. Only one ballot per member will be allowed.

Step Four: All envelopes will be opened face-down, ballots removed and envelopes put aside, in order that no one could later match specific ballots to specific voters. After all envelopes are opened and ballots removed, both envelopes and ballots will be counted as a final cross-check. (All return envelopes shall be kept to recount the total vote after ballots are counted.) Members of the Election Committee will then tabulate election results. The general membership will be allowed to observe tabulations of results as long as there is no interference or attempted participation in the tabulation process.

Step Five: After all results have been tabulated, and prior to meeting adjournment, both returned envelopes and ballots will be securely sealed in separate boxes, to be retained for safe keeping by the election Committee Chairman. In case of a disputed election, the boxes could be opened only upon the approval of the Executive Committee and opened only in the presence of eight or more Election Committee members.

In case of a tie between two candidates, a run-off election shall be held between those two candidates alone.

In case of death, resignation, or residence change from state or region from which elected, term will be terminated and the position shall be filled by the person who was runner-up in the previous election.

In case of the elected Board Member or his runner-up being unable or unwilling to serve, then the vacancy will be filled at the next regular election.

*Note: Any deviation from this detailed plan will be considered in violation of the election process, and the election will be considered null and void.*

7.                                    - - - -

8.      Ballots placed in the post office box on October 16, 1995, were picked up on October 17, 1996, and mixed with ballots placed in the box on and before October 15, 1995, and all were counted.

9.                                    - - - -

-4-

10.     The by-laws were violated by the unauthorized procedure.

11.     The executive committee wrongfully ratified the report of the election committee.

12.     The actions of the executive committee and executive director were in willful disregard of the by-laws and a breach of fiduciary duty.

14.     Burke, Kerkeles and Thompson, as directors, are entitled to sue under TCA § 48-56-401.  On October 20, 1995, Kerkeles complained to the executive director of the irregularity.

15.     On October 30 and November 29, 1995, the defendants ratified the irregular procedure.

The prayers of the amended complaint were:

1.     For process

2.     For a declaration of the rights of the parties pursuant to TCA 29-14-101 et seq. and a declaration that the election is void.

3.     For a declaration that all actions of the board of directors and executive committee since taking office are void.

4.     For a new election.

5.     For judgment against the directors and executive director for all expenses due to this suit and a new election.

6.     For costs and attorney fees.

7.    For general relief.

The defendants' answered, admitting the identity of the parties, and the by-laws but denying the mishandling of the ballots as alleged in the complaint. The answer alleged that the association was a not-for-profit corporation, that the complaint filed to state a claim for which relief can be granted, and that plaintiffs lacked standing to present the claim. The answer also asserted that the individual defendants are immunized from liability by TCA 48-58-601(c) and that plaintiffs, Burke, Kerkeles and Thompson are estopped from maintaining the suit.

Defendants responded to an interrogatory that ballots were removed from the post office box on October 16 and 17.

Defendants moved for summary judgment supported by the following evidence.

The deposition of the defendant Cherry states:

Q.    Okay. Now, do you know whether or not the Post Office sends any sort of billing with each day's receipt of your Business Reply Mail?

A.    It's my understanding from Mrs. Brandon that that is the procedure for when we have postage due mail, yes, sir.

Q.    And it's sort of like a receipt, is it not?

A.    That's my understanding.

Q.    You have already paid the postage and they show you how much each day you have used up.

A.    I don't know.
                    - - - -
Q.    Okay. Where are those receipts?

A.    With regard to the ballots?

Q.    Yes.

A.    I don't know.

                    - - - -

-6-

Q.     Have you been told by anybody that those ballots picked up on the 17th did arrive on or before the 15th.

A.     I was told.

Q.     By whom?

A.     By a clerk at the Post Office whose name is Robert.

Q.     Do you know his last name?

A.     No, sir, I don't.

- - - -

A.     Mr. Brewer picked up ballots on Monday morning, that he was told by Tim, another Post Office employee, I believe he said his name was Tim. Tim told Mr. Brewer, according to Robert, that those ballots that he was picking up on Monday morning did not include any ballots that had come in on Saturday or Sunday, because of the book work, the postage due book work that they had to do, and that Tim asked Mr. Brewer to come back on Tuesday morning and he would have those ballots worked up.

Q.     That was on Monday that he was told that?

A.     Yes, sir, that's my understanding from Robert.

- - - -

A.     He told me that the ballots that Mr.Brewer and whomever picked up on Monday, that Tim had informed Mr. Brewer that there were no Saturday or Sunday ballots in that group of ballots that he picked up on Monday morning, that he should come back on Tuesday morning and give him a chance to do his book work and he would have those ballots ready for him.

Q.     Okay. Did you speak with him with regard to what was picked up on Tuesday morning?

A.     With Robert?

Q.     Yes.

A.     Yes, sir. I believe, Mr. Wheeler, in that conversation Robert volunteered that the ballots that were picked up on Tuesday morning included the ballots that came in on Friday -- I'm sorry, on Saturday, Sunday and Monday.

- - - -

Q.     Where in the bylaws does it provide for an exception to the 15th falling on a Sunday?

A.     It does not.

-7-

- - - -

Q. Okay. Let me ask you this. In the minutes, let me jump back a little bit, in the minutes of the October 30, 1995 meeting, are there full and complete minutes with regard to the discussion on the election process?

A. I'm not sure what you mean by full and complete. It's not a verbatim transcript.

Q. But whatever discussion was had would be written down in the minutes, whatever discussion was had with regard to the objection to the election procedures?

A. The objection to the election procedure?

Q. Well, the issue came up by October 30th, did it not, that there was some disagreement over picking up ballots on the 17th?

A. At that October 30th meeting, I read Mr. Brewer's report to the Executive Committee. I told the Executive Committee about Mr. Kerkeles' phone call and our discussion just as I have told you. And I also told the Executive Committee at that time that I felt responsible for whatever problem was out there because I had made the suggestion to Mr. Brewer to give an extra day on the ballots and he had done that.

The deposition of Robert Brewer states:

Q. Did you pick up ballots in 1994 on Monday?

A. Yes. I was there I know on the afternoon pickup.

Q. All right. Did you go yourself to the Post Office on Monday, October 16, 1995 to pick up ballots?

A. Yes.

Q. Who went with you?

A. I believe that it was Nolan Benton and Bob Tanner.

Q. Okay. And what time did you go?

A. Right around 8:30, 8:40 when somebody else got here to go with me.

- - - -

Q. Okay. Let me ask you this. Like 1994, then did you go back in the afternoon of Monday of '95?

A. No.

-8-

- - - -

Q.    Why?

A.    I was told that I'd have to make a pickup on Tuesday morning.

Q.    And who told you that?

A.    Mr. Cherry.

Q.    What did he say?

A.    He just said since it was a holiday I need to make another pickup on Tuesday morning.

Q.    Since what was a holiday?

A.    Since Sunday was the 15th.

Q.    And did you understand that to be a directive from him to go pick them up on Tuesday?

A.    That's what he told me to do.

- - - -

Q.    So it doesn't make any difference if ballots were received in the Post Office on the 16th, you think they were properly included in all the ballots?

A.    Yes.

Q.    Because the 15th fell on a Sunday?

A.    Correct.

Q.    All right.

A.    Now, there were other ballots that came in later than that.

Q.    Were they counted?

A.    No.

Q.    All right. Did you pick up ballots -- did you on Wednesday go over and pick up ballots?

A.    No. They were delivered here later.

Q.    By what authority do you rely to say that ballots received in the Post Office on Monday the 16th should be counted?

A.    Nothing other than the fact that it's just like your income tax or your electric bill or water bill or anything else that is due on that day, or the practice here that if Stallion reports or anything are

received a day late because of a holiday, that they're allowed and counted.

The memorandum supporting the motion for summary judgment asserted the following grounds:

1.    Failure to state a claim.

2.    Lack of standing because none of the plaintiffs was eligible for election in the subject election ( an eligible candidate was later added as a plaintiff).

3.    Plaintiffs were estopped by failure to pursue remedies within the association.

4.    Immunity of officials of a not-for-profit corporation. Although asserted in the answer, no evidence of this fact is cited or found. However, the parties have stipulated to this Court that the Association is a not-for-profit corporation.

5.    The "breach of fiduciary duty" count is not brought on behalf of the association.

6.    No "justiciable controversy" for a declaratory judgment.

The Trial Judge filed a memorandum opinion stating:

> There is a policy against substituting the judgment of a court for the judgment of a corporate board or employee. This policy is reflected both in the business judgment rule and also in the immunity granted to directors and officers of non-profit corporations for decisions made which are not willful, wanton, or gross negligence. To some extent this hands-off policy is that upon which the Defendants rely in their argument that the Plaintiffs are estopped from challenging an election which they did not challenge in the corporate decision making process. It is similar to the argument for dismissing court actions where a challenging party has not exhausted his or her administrative remedies. The policy is the same in both situations: courts should not be making nonlegal decisions when there exist bodies better suited to make those decisions.

In the case *sub judice*, the Bylaws cannot be applied as written in a year in which the deadline date falls on a Sunday with absolute certainty that all and only ballots received at the Post office on or before the deadline date are counted. The ballots were to be counted if they were received *at the Post Office* by October 15. Unfortunately it was impossible to determine which ballots were received on Sunday. It is undisputed that the Post Office received mail on Sundays, but that they did not process mail there on Sundays. If the corporation had only counted ballots placed in their box on or before October 14, a Saturday, then they theoretically would have been omitting ballots which were in fact received at the Post Office on October 15, the deadline date.

The Executive Committee therefore faced a situation in which the Bylaws could not be applied strictly as written because they could not ascertain what ballots were in the Post Office on October 15. The Executive Committee opted for a course of action reasonably calculated to comply substantially with the Bylaws. There is absolutely no proof in this record that anyone on the Executive Committee had any motivation to affect the outcome of the election, to favor any candidate or to scuttle any candidate, or to do anything other than get the most accurate possible count of ballots received at the Post Office by October 15. There is no proof that anyone knew, or knows today, how the outcome of the election was or would be altered by including ballots picked up on Monday or Tuesday. Even if the approach was not the most prudent and was not expressly approved by the Bylaws, it was not forbidden by the Bylaws and in fact was consistent with the corporation's prior procedure as to deadlines, including ballot deadlines. It should be remembered that a postmark is placed on an envelope when it is mailed by a Post Office and not when it is received in a Post Office.

This trial court exercises its discretion not to render a declaratory judgment on the validity of an election to the board of a nonprofit corporation where the duly responsible subdivision of the corporation determines how best to conduct an election which is impossible to conduct with absolute precision under the terms of the Bylaws and under the circumstances of a Sunday deadline date. It is particularly inappropriate to entertain a declaratory judgment action when the complaining parties did not raise the issue before the Executive Committee, the full Board or the membership at their meetings and when all three bodies approved the election results.

This is likewise an inappropriate case for a derivative action under Tennessee Code Annotated § 45-56-401 or Rule 23.06 of the Tennessee Rules of Civil Procedure. There are no facts alleged which constitute a breach of fiduciary duty. The interest of the corporation were not compromised, and the Bylaws were not violated. There is no willful, wanton, or gross negligence, so the immunity provided by the Tennessee Code Annotated § 48-58-601(c) applies here as well, at least as to the individual defendants. This is not a situation in which the assets of the corporation are allegedly being wasted or the Executive Committee is intentionally attempting to affect the outcome of

corporate elections. When the Board and membership of the corporation ratified the Executive Committee's solution to the counting dilemma, they acted on behalf of the entire corporation or someone on its behalf cannot be heard now to complain about a counting process which the entire corporate membership has previously approved. At the very least, the Plaintiff's should be estopped from challenging a counting process which they could have but did not challenge before the Board and the membership. It is undisputed that the corporation relied on the validity of the election and that the elected Board has acted on behalf of the corporation since their election. To void the election would put

at risk every single action taken by the Board since the election. It would also establish a precedent of having a court review every internal decision made by the corporation.

If in fact the individual members of the Executive Committee are immune from suit, then the derivative action would become an action of the corporation against the corporation to challenge an action approved by the entire corporation acting through its assembled membership at its membership meeting. Ordinarily a derivative suit would be brought on behalf of the many to prevent the few from acting for their own benefit and against the interest of the many. In the case *sub judice*, a few are attempting on behalf of the many to have a judge substitute his judgment for the judgment of the many, here the entire membership. This is not the purpose of Tennessee Code Annotated § 45-56-401 or of Rule 23.06. The membership of the corporation is entitled to decide for themselves whether to allow a subdivision to conduct an election vote count in a certain manner when circumstances render an exact count impossible. The Plaintiffs should focus their energies on amending the Bylaws to anticipate such a situation.

The undisputed facts in this case require that this trial exercise its discretion not to entertain this declaratory judgment action. On the undisputed facts, it is held as a matter of law that a derivative suit on behalf of the corporation will not lie on these facts, and that even if it would, it should be barred by the doctrine of estoppel.

On appeal, plaintiffs present the following issues:

## I.

Whether or not the by-laws of the Tennessee Walking Horse Breeders' and Exhibitors' Association constitute a contract between it and its membership sufficient to justify an action for declaratory judgment for the purpose of determining the rights of the parties.

## II.

Whether this is an appropriate derivative action by the members of a non-profit association and whether the actions of the executive committee in ratifying an illegal election constitutes an ultravires act for which they can be held personally liable.

## III.

Whether there are material issues of fact in dispute in this case sufficient to require a trial on the merits thereby rendering inappropriate the trial court's dismissal on a motion for summary judgment.

## IV.

Whether the trial court erred in refusing to release, pursuant to a request to produce, a tape recording of the November 29, 1995 conference call of members of the executive committee on grounds that the recording constitutes privileged communications and work product, and that no part of it, even a redacted version eliminating all comments by and questions to the association's lawyers could be reviewed by the plaintiffs.

## I.

## DECLARATORY JUDGMENT

TCA § 29-14-103 provides in pertinent part as follows:

Any person interested under a deed, will, written contract, or other writings, constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Prerequisites to the right to a declaratory judgment are substantial present interest and standing to present it. In *Knapp v. Golden Cross*, 121 Tenn. 212, 118 S.W.390 (1908), the corporation "members" of a fraternal benefit each of whom held a "Benefit Certificate" sued to enjoin a merger with another similar corporation in violation of the corporate charter. Citing

authorities upholding the rights of dissenting stockholders, the Supreme Court upheld the right of the dissenting certificate holders to sue for violation of the charter. The cited authority is distinguishable from the present case in which the plaintiffs allege no property interest, such as a stock certificate or benefit certificate. According to the complaint only one plaintiff has any real interest in the controversy, and that is an opportunity to be elected to an honorary office in a corporation in which the complaint does not allege that he holds financial interest. There is no allegation in the complaint that any plaintiff suffered any property loss as a result of the facts alleged.

Plaintiffs insist, without citation of authority, that, as members and directors, they have an "interest" in the proper conduct of the affairs of the association. This is naturally true, but such an interest is not the substantial property interest required to sustain an action for declaratory judgment.

It is true, as insisted by plaintiffs, that the difficulties of the postal authorities in processing the ballots were not shown by competent evidence; but this infirmity is immaterial to the failure of the complaint to allege facts to sustain the right of the plaintiffs to maintain a suit for declaratory judgment.

Moreover, the decision of the Trial Judge not to entertain the suit for declaratory judgment is supported by the undisputed evidence that the questioned procedure was approved by the executive committee without protest by any plaintiff at the meeting. An informal discussion with the executive director is not an adequate substitute for a formal written protest to the executive committee, or oral presentation at the meeting which approved the election.

Tennessee courts should construe the declaratory judgments statutes broadly. Tenn. Code Ann. § 29-14-113; *Cummings v. Beeler*, 223 S.W.2d 913, 917 (1949). However, ultimately decisions concerning whether to grant or deny a declaratory judgment are left to the trial court's

discretion. *East Sevier County Utility District v. Wachovia Bank & Trust Co.*, 570 S.W.2d 850, 852 (Tenn. 1978); *Wunderlich v. Fortas*, 776 S.W.2d 953, 956 (Tenn. Ct. App. 1989). The exercise of this discretion depends on the unique facts of each case. *Tennessee Farmers Mutual Insurance Co. v. Hammond*, 290 S.W.2d 860, 862 (1956).

Judge Russell chose not to entertain an action for declaratory judgment. In *Southern Fire & Cas. Co. v. Cooper*, the Court stated that the trial court's discretion to render a declaratory judgment is "very wide" and "the action of the trial court in refusing a declaration should not be disturbed by this, an Appellate Court, unless the refusal be arbitrary." 292 S.W.2d 177 (Tenn. 1956) *Citing Nicholson v. Cummings*, 217 S.W.2d 942 (Tenn. 1949).

In *Southern Railway Company v. Atlantic Coast Line Railroad Company*, the Court stated:

> This Court has repeatedly held in numerous cases since the enactment of the Act (The Declaratory Judgments Act) that where the Court does not arbitrarily act in refusing to entertain such a suit but exercises a sound discretion, neither entertaining nor denying the suit, that then the appellate court will not disturb such a finding.
>
> - - - -
>
> [O]n appeal where the chancellor has exercised the proper discretion this discretion will not be disturbed. What is meant by saying that the trial court has exercised a proper discretion? We think that it means a sound discretion, exercised, not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances of the law, and directed by the Chancellor's reason and conscience to a just result.
>
> 352 S.W.2d 217, 219 (Tenn. 1961).

The primary purpose of the Uniform Declaratory Judgment Act is the construction of definitely stated rights, status, and other legal relations commonly expressed in written instruments. *Standard Ace, Ins. Co. v. Carvin*, 400 S.W.2d 235, 236 (Tenn. 1966). Tennessee courts will only grant declaratory relief to parties who have a real interest in the litigation, *Memphis Publishing Co. v. City of Memphis*, 513 S.W.2d 511, 512 (Tenn. 1974), and when the

case involves present rights that have occurred under presently existing facts. *West v. Carr*, 370 S.W.2d 469 (Tenn. 1963).

In the present case the action of the executive committee has the benefit of presumed good faith and reasonable grounds which are not negatived by any evidence.

## II.

## DERIVATIVE ACTION

Plaintiffs insist that their derivative action on behalf of the corporation should not have been dismissed.

In respect to for-profit corporations, Tennessee authorities recognize and follow the "business judgment rule." *Chism v. Mid-South Milling Co.*, Tenn. 1988, 762 S.W.2d 552; *Wallace v. Lincoln Savings Bank*, 89 Tenn. 630, 15 S.W. 448 (1891); *Lewis v. Boyd*, Tenn. App. 1992, 838 S.W.2d 215; *French v. Appalachian Electric Cooperative*, Tenn. App. 1978, 580 S.W. 565; *Range v. Tenn. Burley Tobacco Growers Association*, 41 Tenn. App. 667, 298 S.W.2d 545 (1955). Cert.. Den. 355 U.S. 813, 78 S.Ct. 11, 22 Ed.2d 30 (1958).

Tennessee statutes, rules and authorities also recognize the necessity of a written demand to the directors to take corrective action before instituting a stockholder's derivative suit. TCA 48-17-401(b), TRCP 23.06. *Akin v. Mackie*, 203 Tenn. 113, 310 S.W.2d 164 (1958), *Boyd v. Sims*, 87 Tenn. 771, 11 S.W. 948 (1889).

The foregoing rules for ordinary corporations apply with even greater effect in regard to not-for-profit corporations in which there are no stockholders holding a property interest to suffer loss as a result of corporate action.

In *Hadden v. City of Gatlinburg,* Tenn. 1988, 746 S.W.2d 687, the plaintiffs were stockholders in a corporation which operated a restaurant which lost business because of construction operations of the defendant. Plaintiff/stockholders obtained a judgment for damages. The Supreme Court reversed and dismissed, holding that the stockholders could not maintain an action for damages sustained by their corporation. The same rule applies with even greater force where the plaintiffs allege no property right in the association.

Plaintiffs assert that members of a non-for-profit corporation have a right to bring a derivative action, citing TCA 48-56-401. However, that statute contains the following provision:

> (c) A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the directors and either why the plaintiffs could not obtain the action or why they did not made the demand. If a demand for action was made and the corporation's investigation of the demand is in progress when the proceeding is filed, the court may stay the suit until the investigation is completed.

As heretofore discussed, the complaint in the present case does not comply with the quoted statute.

In *Bourne v. Williams*, Tenn. App. 1981, 633 S.W.2d 469, two members of a not-for-profit corporation were permitted to maintain a suit against the directors and executive committee for wasting corporate assets and using corporate assets for personal gain. No such misconduct is alleged in the present case.

In *Hannenwald v. Fairfield Communities*, Inc., Tenn. App. 1983, 651 S.W.2d 222, members of a community club brought an action to enforce an agreement by a real estate developer with a not-for-profit corporation of which plaintiffs were members to pay the dues of plaintiffs to the not-for-profit corporation. Inasmuch as the plaintiffs benefitted financially from the performance of the agreement, this Court held that plaintiffs had a right to bring a derivative

action on behalf of their not-for-profit corporation to force the developer to pay sums due the not-for-profit corporation which would inure to the benefit of plaintiffs.

In the present case, the complaint contains no averment that the relief sought will result in a financial benefit to the corporation or to them.

Plaintiffs concede that the individual defendants are immunized by TCA § 48-58-601 against all conduct except that which is wilful, wanton or gross negligence. The complaint fails to allege any action by any of the individuals which would amount to wilful, wanton, or gross negligence.

## III.

### DISCOVERY OF TAPE RECORDING

On March 25, 1996, plaintiffs filed a request for production for inspection and copying of a tape recording of a telephone conference of the executive committee on November 29, 1995, pertaining to the ratification of the subject election.

On April 9, 1996, plaintiffs filed a motion to compel said discovery.

Defendants responded that the contents of the tape were irrelevant and would not lead to the discovery of admissible evidence. Defendants also pled the privilege of confidential communications of clients to attorney and work product, and requested a protective order.

The Trial Court (acting through a judge sitting by interchange) entered a protective order reading as follows:

> This Court is called upon to sit by interchange for the limited purpose of reviewing certain materials which plaintiff's have requested to discover and determine if the materials are beyond the scope of discovery. Specifically, the Court has

reviewed a tape and transcript of a meeting. Since no evidentiary hearing was conducted in this matter, in making its decision the Court has assumed that the participants in the above mentioned meeting were parties or attorney's for parties in the above captioned lawsuit. If this be the case, the Court finds that the majority of the conversation of the participants are beyond the scope of discovery.

As noted above, no evidentiary hearing has been conducted on this motion. However, the Court can glean from the transcript submitted as well as the court file that certain individuals filed suit on November 29, 1995 against the Tennessee Walking Horse Breeder's and Exhibitor's Association and others. A conference call was arranged involving several individuals (the pleadings refer to these persons as the Executive Committee of the TWHBEA and their attorneys). It is noted that two of the participants are the present attorney's of record for the defendants.

The contents of the conversations had in this conference call may be generally categorized in one of the below listed groups:

I.       A discussion of the contents of the lawsuit.

II.      A discussion of the parties involved in the lawsuit.

III.     A discussion of the merits and ramifications of the lawsuit.

IV.      A discussion of procedural strategies and legal theories.

V.       A discussion of the impact of the lawsuit as it relates to current practices and procedures of the Association.

Each of the discussions listed above were predicated upon questions posed to the attorneys' seeking the attorney's mental impressions, conclusions and advice.

Defendant's contend the conversations between the individuals participating in the conference call and the attorneys are protected by the so-called attorney-client privilege. TCA § 23-3-105 provides:

> Privileged communications. - No attorney, solicitor or counselor shall be permitted, in giving testimony against a client, or person who consulted him professionally, to disclose any communication made to him as such by such person, during the pendency of the suit, before or afterwards, to his injury . . . .

The above statute does not exclude all communications between an attorney and his client. Humphreys, Hutcherson

& Mosley v. Donovan, M.D., Tenn. 1983, 568 F.Supp. 161, aff'd. 6th Cir. 1985, 755 F.2d 1211. The privilege applies only to the extent that the attorney's communications to a client were specifically based upon a client's confidential communication or would otherwise, if disclosed, directly or indirectly reveal the substance or tenor of a confidential communication. See in re Sealed Case, 737 F.2d 94, 101-02 (D.C. Cir. 1984). The privilege does not extend to communications from an attorney to a client when they contain advice solely based upon public information rather than confidential information. See Congoleum Indust., Inc. v. G.A.F. Corp., 49 F.R.D. 82, 85-86 (E.D. Pa. 1969), aff'd, 478 F.2d 1398 (3d Cir. 1973). Further, if the advice rendered by the attorney was clearly not intended to relate to client confidentiality, such as advice regarding the setting of a court date, it is not privileged. See United States v. Gray, 876 F.2d 1411 (9th Cir. 1989); United States v. Innella, 821 F.2d 1566 (11th Cir. 1987). Advice given on general questions of law, when no facts are or need be disclosed or inferred which would implicate the client, would not ordinarily be covered by the privilege. Jackson v. State, 293 S.W. 539, 540 (1927).

Some of the conversations of the parties may fall into the above recognized exceptions and are not excluded from discovery by T.C.A. § 23-3-105. However, the Court need not analyze each conversation in the context of the above and other recognized exceptions to the privilege. The Court is of the opinion that all conversations with the exception of the vote taken after the discussion of the lawsuit are subject to the work product rule.

The Tennessee work product rule is found in Rule 26.02(3), Tenn. R. Civ. Proc., the relevant portion of which provides:

> TRIAL PREPARATION: MATERIALS. Subject to the provisions of subdivision (4) of this rule, a party may otherwise discoverable under subdivision (1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnifier, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The work product doctrine is designed to prevent one party from discovering materials prepared in anticipation of litigation by the other party's attorney; the rule thereby prohibits the party from learning of the adversary's mental impressions, conclusions, and legal theories of the case. Memphis Publishing Co. v. The The Commercial Appeal, 871 S.W.2d 681 (S.Ct. 1994); Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 51 L.Ed.2d 451 (1947). While not a privilege itself, it was intended to augment the traditionally narrow attorney-client privilege. F. James, Civil Procedure § 6.9, at 204 (1965). See also D. Paine, Tennessee Law of Evidence § 96. As such it does not provide an absolute shield from discovery; rather it is qualified and can be overcome upon a proper showing. Southeastern Fleet Leasing, Inc. v. Gentry, 416 S.W.2d 773, 778 (1967). A party seeking to dis-

cover the work product of the adversary party or his Attorney must show good cause for the discovery supported by proper affidavit. Medic Ambulance Service, Inc. v. McAdams, 216 Tenn. 304, 392 S.W.2d 103 (1965).

Those portions of the conversations of the participants in the transcript reviewed by this Court not protected by the attorney-client privilege pertained to the mental impressions, conclusions, and legal theories of the case by the participating attorneys. Plaintiff's have failed to show good cause for the discovery supported by proper affidavit. Accordingly, a Protective Order baring their discovery is hereby Ordered.

The Clerk shall keep the tape and transcript under seal for appropriate appellant review.

Plaintiffs fail to sustain their allegation of error in the foregoing order with which this Court fully concurs. There is no showing of which parts of the record of the conference should be unsealed and considered on appeal.

## IV.

### DISCRETIONARY COSTS

Plaintiffs only argument on this subject is that the matter of discretionary costs should have been reserved until the conclusion of the trial upon the merits. No reversible error is shown in the actions of the Trial Judge.

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against the appellants, jointly and severally and their surety. The cause is remanded to the Trial Court for any necessary further proceedings.

**AFFIRMED AND REMANDED**

_____
HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

CONCURS:

_____
SAMUEL L. LEWIS, JUDGE

CONCURS WITH RESULTS:

_____
WILLIAM C. KOCH, JR., JUDGE