Richard A. LEWIS, on Behalf of CITIZENS SAVINGS BANK & TRUST COMPANY, Plaintiff/Appellant,

Citizens Savings Bank & Trust Company, Appellee,

v.

T.B. BOYD, III; William R. Bailey; Mabel L. Boyd; George E. Butler; Edward E. Caldwell; Mattye C. Flowers; H.A. McClaron; and Henry Hill, Jr., Current members of the Board of Directors of Citizens Savings Bank & Trust Company, Inc.; Deborah Scott–Ensley, Executive Vice President and Cashier of Citizens Savings Bank & Trust Company, Inc.; and member of the Board of Directors; and Julian Blackshear, General Counsel and Secretary to the Board of Directors of Citizens Savings Bank & Trust Company, Inc., Defendants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

May 29, 1992.

Martin E. Simmons, Mary Neil Price, Davis W. Turner, Dearborn & Ewing, Nashville, for plaintiff, appellant.

Steven A. Riley, E. Clifton Knowles, Bass, Berry & Sims, Nashville, for appellee.

## OPINION

KOCH, Judge.

This appeal involves a dispute between the board of directors and the former president of a Nashville bank. The former president filed a shareholder's derivative action in the Chancery Court for Davidson County alleging mismanagement and self-dealing by several of the bank's directors and officers. The trial court dismissed the suit after a special litigation committee appointed by the bank's board determined that pursuing the litigation would not be in the bank's best interests. The former president has appealed. We affirm the dismissal of the derivative complaint.

### I.

Citizens Bank & Trust Company is a small state-chartered bank. It was organized in Nashville in 1904 and, during the period of this dispute, had between $30 and $38 million in assets. The bank is effectively controlled by the chairman of its board of directors who owns or controls more than one-half of its stock.

The bank's financial condition during most of the 1980's was precarious. It posted net operating losses from 1984 through 1988, and its annual financial statements from 1984 through 1989 raised "substantial doubt about the Bank's ability to continue as a going concern." Because of its poor performance, the bank was operating under a series of memorandums of understanding with the Federal Deposit Insurance Corporation and the Commissioner of Financial Institutions in which the bank agreed, among other things, to increase its primary capital, to reduce the number of delinquent loans, and to maintain an adequate reserve for loan losses.

Richard A. Lewis served as the bank's president until July 25, 1984 when he resigned in accordance with a settlement agreement negotiated with the bank's board. Mr. Lewis continued to be one of the bank's largest shareholders and remained on the board through September 1985. Mr. Lewis was apparently not on good terms with the bank's officers and directors when he left the board.

During 1986 and 1987, Mr. Lewis took issue with several of the board's decisions and with the manner in which the board presented these decisions to the bank's shareholders. In August 1986, he objected to the procedure used to obtain shareholder approval for $250,000 in debentures and also questioned the board's approval of loans to three board members and to a company controlled by the board's chairman. In November 1987, he took issue

with the adoption of a restated charter clarifying the bank's capital structure and limiting the liability of the board of directors.

Mr. Lewis sent a letter to Citizens Bank in July 1988 asserting that its officers, directors, and general counsel were operating the bank "with blatant disregard for the requirements of banking and corporate law" and that these persons were failing "to discharge their duties in good faith." Mr. Lewis formally demanded that the bank file suit against several of its officers and directors and its general counsel. Mr. Lewis also threatened to file his own suit if the bank did not take "sufficient affirmative steps" within twenty days.

Citizens Bank retained special counsel to look into Mr. Lewis' allegations. In October 1988, the bank's special counsel provided Mr. Lewis with its preliminary conclusions concerning the matters raised in his July 1988 letter. The special counsel expressed "serious doubt that any of the matters set forth in Mr. Lewis' letter have merit" and stated that "uncertainties associated with some of the matters discussed" might prompt some "appropriate corrective actions" as well as a special shareholders' meeting at which Mr. Lewis' role in causing the bank's loan losses would be disclosed and discussed. The reference to his performance as president prompted a heated response from Mr. Lewis.

On November 9, 1988, the bank's special counsel informed Mr. Lewis that meetings of the board and the stockholders had been scheduled in late November and early December to consider the issues raised in his demand letter. Rather than awaiting the outcome of these meetings, Mr. Lewis filed a derivative action on November 16, 1988, naming the chairman of the board and six other present and former board members and officers as defendants.

One week after Mr. Lewis filed suit, the board appointed the bank's current president, Rick Davidson, as a one-person special litigation committee to review Mr. Lew-

is' allegations and to determine whether maintaining the suit was in the bank's best interests.[1] The Reverend William A. Alexander, Sr., another bank director who was also the minister of Mr. Davidson's church, later joined Mr. Davidson on the committee. In March 1989, Mr. Davidson resigned from the committee and was replaced by Frank Grace, Jr., a Nashville attorney who was appointed to the board solely to enable him to serve on the special litigation committee.

The bank's shareholders ratified the board's decision to create a special litigation committee at a special meeting in December 1988. At the same meeting, the shareholders adopted resolutions clarifying the bank's capital structure and ratifying their earlier decision to place limitations on the directors' liability.

The bank's special counsel provided its report to the special litigation committee in October 1989. The report concluded that Mr. Lewis' claims "lacked any substantial merit" and that his derivative action should not be allowed to proceed because "[o]ne man's grudge should not be allowed to thwart the current progress of the Bank."

The special litigation committee discussed the substance of Mr. Lewis' complaint with the bank's auditors, the state regulators, Mr. Lewis and his counsel, and various officers and directors of the bank. In its April 25, 1990 report, the committee concluded that continuing Mr. Lewis' suit would not be in the bank's best interests. The committee found that Mr. Lewis' complaints were without merit except perhaps for the procedures used to approve and issue the debentures and the preferred stock. But while the committee concluded that the issuance of the debentures and preferred stock "may have been procedurally challengeable," it determined that further litigation of this issue would not be warranted because of the changes in the bank's capital structure approved by the shareholders in December 1988.

---

1. Mr. Davidson became president of the bank in September 1988, after the actions involved in Mr. Lewis' complaint took place.

The committee concluded its report by emphasizing that pursuing Mr. Lewis' suit would be destructive to the bank's image. It pointed out that

> The Bank is a fragile institution and always has been. It has not in the past had access to large amounts of capital nor to a large entrepeneural [sic] or commercial customer base. Nevertheless, it is looked upon as a symbol in its community and has been a resource and source of pride in that community for many years.[2]

In June 1990, the bank moved to dismiss Mr. Lewis' suit in light of the special litigation committee's recommendation. In November 1990, the trial court filed a memorandum opinion finding that the special litigation committee had acted independently and competently and that its conclusions were reasonable and appropriate. Accordingly, on November 27, 1990, the trial court filed an order dismissing Mr. Lewis' complaint.

## II.

Derivative suits are not commonplace in Tennessee's courts. As a result, this appeal presents our first opportunity to consider the use of special litigation committees in derivative litigation. Since these committees are consistent with traditional principles of corporate governance, we join the jurisdictions recognizing them as an appropriate way to give voice to a corporation's interests in derivative litigation.

## A.

■ A corporation is a legal entity separate and distinct from its shareholders, officers, and directors. *Hadden v. City of Gatlinburg*, 746 S.W.2d 687, 689 (Tenn. 1988); *Neese v. Fireman's Fund Ins. Co.*, 53 Tenn.App. 710, 717, 386 S.W.2d 918, 921 (1964). The responsibility for managing a corporation's business and affairs falls on its officers and directors, not its shareholders. *Boyd v. Sims*, 87 Tenn. 771, 775–76, 11 S.W. 948, 949 (1899); Tenn.Code Ann. § 48–18–101(b) (1988). This responsibility extends to determining whether the corporation should pursue judicial remedies for its injuries. *Daily Income Fund v. Fox*, 464 U.S. 523, 532, 104 S.Ct. 831, 836, 78 L.Ed.2d 645 (1984).

■ Tennessee's courts have consistently followed a noninterventionist policy with regard to internal corporate matters. They have recognized that directors have broad management discretion. *Chism v. Mid–South Milling Co.*, 762 S.W.2d 552, 556 (Tenn.1988) (discretion in employing or discharging corporate officers); *Wallace v. Lincoln Sav. Bank*, 89 Tenn. 630, 636, 15 S.W. 448, 449–50 (1891). Accordingly, they have declined to substitute their judgment for that of a corporation's board of directors when the board has acted in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. *French v. Appalachian Elec. Coop.*, 580 S.W.2d 565, 570 (Tenn.Ct.App.1978); *Range v. Tennessee Burley Tobacco Growers Ass'n*, 41 Tenn.App. 667, 675, 298 S.W.2d 545, 549 (1955), *cert. denied*, 355 U.S. 813, 78 S.Ct. 11, 2 L.Ed.2d 30 (1958).

These decisions squarely align Tennessee with the jurisdictions recognizing and following the "business judgment rule." *Levine v. Smith*, 591 A.2d 194, 197–98 (Del. 1991); *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 999–1000 (1979); 3A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1039 (rev. perm. ed. 1986); Dennis J. Block, Stephen A. Radin & James P. Rosenzweig, *The Role of the Business Judgment Rule in Shareholder Litigation at the Turn of the Decade*, 45 Bus.Law. 469, 489–90 (1990) ("Block, Radin & Rosenzweig"). Thus, like other courts following the business judgment rule, we presume that a corporation's directors, when making a business decision, acted on an informed

---

**2.** At a shareholders' meeting in March 1986, the chairman of the bank's board pointed out that "[t]his institution has or was founded by men and women that had an undying and unselfish dream of a financial institution owned and operated by our black citizens, that would service any special needs that may be unique in order to service the financial needs of our community."

basis, in good faith, and with the honest belief that their decision was in the corporation's best interests. *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del.1990); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del.1981).

### B.

The business judgment rule has also shaped the courts' view of shareholder derivative actions. These actions include suits brought by one or more shareholders on a corporation's behalf to redress an injury sustained by, or to enforce a duty owed to, a corporation. *Daily Income Fund, Inc. v. Fox*, 464 U.S. at 527–29, 104 S.Ct. at 834; *Bourne v. Williams*, 633 S.W.2d 469, 471 (Tenn.Ct.App.1981); H. Henn & J. Alexander, *Laws of Corporations and Other Business Enterprises* § 360, at 1045 (3d ed. 1983).

A derivative action is an extraordinary, equitable remedy available to shareholders when a corporate cause of action is, for some reason, not pursued by the corporation itself. *Kamen v. Kemper Fin. Servs., Inc.*, — U.S. —, —, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991) (equitable remedy); *Lewis v. Graves*, 701 F.2d 245, 247 (2d Cir.1983) (extraordinary remedy); *Levine v. Smith*, 591 A.2d at 200 (uniquely equitable remedy); 13 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5941.10 (rev. perm. ed. 1991) (extraordinary remedy). It is a limited exception to the usual rule that the proper party to assert a corporate cause of action is the corporation itself, acting through its directors or a majority of its shareholders. *Daily Income Fund, Inc. v. Fox*, 464 U.S. at 531–32, 104 S.Ct. at 836; *State v. Mitchell*, 104 Tenn. 336, 348–49, 58 S.W. 365, 368 (1899) (redress for wrongs against a corporation should be by the corporation itself).

All jurisdictions impose threshold preconditions on derivative suits in order to allow the directors to occupy their normal status as the conductors of the corporation's affairs, to encourage informal resolution of intracorporate disputes, and to guard against misuse of the derivative remedy. The most common precondition requires the shareholder to first make a written demand on the corporation's directors requesting them to prosecute the suit or to take other suitable corrective action. This precondition is commonly known as the "demand requirement." D. DeMott, *Shareholder Derivative Actions* §§ 5.01, 5.03 (1987) ("DeMott"); 13A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5963 (rev. perm. ed. 1991); ALI Principles of Corporate Governance: Analysis and Recommendations § 7.03(a) (Tent. Draft No. 8, 1988).

Tennessee's courts have recognized and imposed the demand requirement for over one hundred years. *Akin v. Mackie*, 203 Tenn. 113, 119, 310 S.W.2d 164, 167 (1958); *Boyd v. Sims*, 87 Tenn. at 775–76, 11 S.W. at 949; *Deaderick v. Wilson*, 67 Tenn. (8 Baxt.) 108, 131 (1874). At the same time, they have also recognized that the demand requirement should be excused if making the demand would be an "idle ceremony." *State v. Mitchell*, 104 Tenn. at 349, 58 S.W. at 368; *Range v. Tennessee Burley Tobacco Growers Ass'n*, 41 Tenn.App. at 676, 298 S.W.2d at 550. Thus, the courts have excused the demand requirement when the corporation's officers and directors will themselves be defendants or when the officers and directors are in collusion with those who have injured the corporation. *Wallace v. Lincoln Sav. Bank*, 89 Tenn. at 635, 15 S.W. at 449; *Deaderick v. Wilson*, 67 Tenn. at 131.

The demand requirement fashioned in these early cases is now embodied in Tennessee's corporation statutes and in the procedural rules governing derivative actions. Tenn.Code Ann. § 48–17–401(b) (1988) requires that

> [a] complaint in a proceeding in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why he did not make the demand.

Similarly, Tenn.R.Civ.P. 23.06 requires that

> [t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires

from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.

Like the cases on which they are based, these provisions stop short of requiring a precomplaint demand in every derivative action. *Kamen v. Kemper Fin. Servs., Inc.*, —— U.S. at ——, 111 S.Ct. at 1716.[3]

## C.

Courts in some jurisdictions like Tennessee that do not require a precomplaint demand in every case have segregated derivative actions into two categories. "Demand refused" cases are those in which the corporation's directors have refused to take action in response to a shareholder's demand. "Demand excused" cases are those in which a shareholder is not required to make a demand because doing so would be futile. *See* Jerold S. Solovy, Barry Levenstam & Daniel S. Goldman, *The Role of Special Litigation Committees in Shareholder Derivative Litigation*, 25 Tort & Ins.L.J. 864, 867 (1990) ("Solovy, Levenstam & Goldman"); DeMott § 5.05. The distinction is far from academic because it dictates the criteria the courts will use to determine whether to permit a derivative action to proceed over a corporation's objections.

■ Deciding whether a corporation should pursue litigation is presumptively the prerogative of the corporation's board of directors. *Daily Income Fund, Inc. v. Fox*, 464 U.S. at 532, 104 S.Ct. at 836; *Zapata Corp. v. Maldonado*, 430 A.2d at 782. The board's response to a shareholder's demand is thus presumptively protected by the business judgment rule. *Allison v. General Motors Corp.*, 604 F.Supp. 1106, 1122 (D.Del.1985); DeMott § 5.04. Since making a demand prior to filing suit amounts to a tacit admission that a majority of the board is sufficiently independent

and disinterested to respond to the demand, the only issues to be examined in a demand refused case are the good faith and reasonableness of the board's investigation and response to the demand. *Spiegel v. Buntrock*, 571 A.2d at 777.

■ The focus in a demand excused proceeding differs from a demand refused proceeding. In demand excused cases, the grounds for the shareholder's claim are (1) that the board is interested and not independent and (2) that the challenged transaction is not protected by the business judgment rule. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.1984). Thus, demand excused cases require an examination of the corporate decision-makers' interest and independence, *Levine v. Smith*, 591 A.2d at 212, as well as the good faith and reasonableness of its investigation.

## D.

Special litigation committees are the most recent corporate response to shareholder derivative actions. They are usually appointed after the filing of a demand excused derivative action and typically consist of two or more directors who have no direct interest in the litigation. Their sole purpose is to assess the merits of the derivative claim and to recommend whether the derivative suit should be permitted to continue.

The committees began appearing approximately twenty years ago, *see* DeMott § 5.04, and the United States Supreme Court later approved their use for terminating derivative litigation as long as they were recognized by state law. *Burks v. Lasker*, 441 U.S. 471, 486, 99 S.Ct. 1831, 1841, 60 L.Ed.2d 404 (1979). At least eighteen states currently permit the use of special litigation committees either by statute or court decision. Solovy, Levenstam & Goldman, 25 Tort & Ins.L.J. at 866. They have also been incorporated into the

---

**3.** Tenn.Code Ann. § 48–17–401 incorporates many of the Model Business Corporation Act's provisions concerning derivative litigation. *See* Model Business Corp.Act §§ 7.40(2), 7.41–7.45, 7.46(2) (1984). It does not contain the universal demand requirement contained in the Model Act or in the ALI Principles of Corporate Governance. Revised Model Business Corporation Act § 7.42 (1984); ALI Principles of Corporate Governance: Analysis and Recommendations § 7.03 (Tent.Draft No. 8, 1988).

American Bar Association's Model Business Corporation Act and the American Law Institutes' Principles of Corporate Governance. Revised Model Business Corporation Act § 7.44(b)(2) (1984); ALI Principles of Corporate Governance: Analysis and Recommendations § 7.10(a) (Tent. Draft No. 8, 1988). Tennessee's version of the Model Business Corporation Act omits the language specifically authorizing the use of special litigation committees, and, as far as our research shows, no Tennessee appellate court has considered their use or how the courts should view their recommendations.

Virtually all of the courts that have examined special litigation committees have determined that they provide a legitimate vehicle for expressing a corporation's interest in derivative litigation. *See* 13 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 6019.55 (rev. perm. ed. 1991).[4] However, these courts have articulated significantly different views concerning how judges should review these committees' recommendations. The disagreement, for the most part, stems from different perceptions concerning the ability of any special litigation committee to be independent and disinterested.

Many commentators have pointed out that special litigation committees are inherently suspect because they have sided with the defendants in an overwhelming number of cases. Solovy, Levenstam & Goldman, 25 Tort & Ins.L.J. at 864; DeMoss § 5.04. Accordingly, they insist that courts should carefully scrutinize special litigation committee recommendations because of the "structural bias" inherent in the committee's appointment. James D. Cox, *Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of Zapata and the ALI Project*, 1982 Duke L.J. 959, 962–63 ("Cox"). Other commentators discount these structural bias concerns as an implicit rejection of the business judgment of disinterested outside directors. Block, Radin & Rosenzweig, 45 Bus.Law. at 505; Michael P. Dooley & E. Norman

Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared*, 44 Bus.Law. 503, 534–35 (1989).

The disagreement in the literature concerning the reliability of special litigation committees is reflected in the various standards devised by the courts to review a special committee's recommendation that a derivative suit be dismissed. By our count, the courts have fashioned four standards.

The most deferential standard of review comes from the Court of Appeals of New York. It confines the review to the independence and disinterestedness of the committee and to the adequacy and appropriateness of its investigative procedures and methodologies. *Auerbach v. Bennett*, 419 N.Y.S.2d at 929, 393 N.E.2d at 1002–03.

At the opposite end of the spectrum is the two-step standard devised by the Supreme Court of Delaware for use in demand excused cases. Like the New York standard, the Delaware standard's first step scrutinizes the committee's independence and disinterestedness and the adequacy of the investigation. However, its second step permits the court, in its discretion, to review the committee's recommendation using its "own independent business judgment." *Kaplan v. Wyatt*, 499 A.2d 1184, 1192 (Del.1985) (use of the second step is within the court's discretion); *Zapata Corp. v. Maldonado*, 430 A.2d at 789.

The Supreme Court of North Carolina, adopting what it viewed as a "modified *Zapata* rule" for both demand refused and demand excused cases, held that

the court must make a fair assessment of the report of the special committee, along with all other factors and circumstances in the case, in order to determine whether the defendants will be able to show that the transaction complained of was just and reasonable to the corporation.

*Alford v. Shaw*, 320 N.C. 465, 358 S.E.2d 323, 328 (1987).

---

**4.** Only one jurisdiction has categorically declined to endorse using special litigation committees. *See Miller v. Register & Tribune Syndicate, Inc.,* 336 N.W.2d 709, 716 (Iowa 1983).

Most recently, the Supreme Judicial Court of Massachusetts fashioned yet another standard. Noting the criticisms of both *Auerbach v. Bennett* and *Zapata Corp. v. Maldonado*, the court held that reviewing courts must determine whether the committee is independent and disinterested and whether the committee "reached a reasonable and principled decision." *Houle v. Low,* 407 Mass. 810, 556 N.E.2d 51, 59 (1990).[5]

E.

The trial court used the *Houle v. Low* standard to review the special litigation committee's recommendation that Mr. Lewis' suit be dismissed. Thus, we must decide whether this or another standard is most consistent with Tennessee's corporate law. Our decision is influenced by the following considerations:

1. courts should not second-guess corporate directors when they are acting in good faith to further the corporation's interests;

2. directors have a "quasi-fiduciary" obligation to the corporation and the shareholders, *Knox–Tenn Rental Co. v. Jenkins Ins., Inc.,* 755 S.W.2d 33, 36 (Tenn.1988);

3. courts have wide latitude in determining the adequacy of a derivative complaint, *Akin v. Mackie,* 203 Tenn. at 121, 310 S.W.2d at 168; and

4. Tenn.Code Ann. § 48–17–401(c) requires judicial approval of the dismissal of any derivative suit.

■■■ We agree with the Supreme Court of North Carolina that a special litigation committee's recommendations should be reviewed using a single standard and that the depth of review should not depend upon whether or not the shareholder made a demand prior to filing suit. *Alford v. Shaw,* 358 S.E.2d at 327. We also join with New York, Delaware, North Carolina, and Massachusetts in holding that the courts must decide whether the members of the special committee are independent and disinterested. In reaching this decision, the court should consider, among other relevant matters: (1) the size of the committee, (2) the committee members' relationship with the corporation's officers and directors, (3) the committee members' qualifications and experience, and (4) the scope of the committee's authority, and (5) the committee's autonomy from the directors, officers, and corporate counsel.

■■■ Since Tenn.Code Ann. § 48–17–401(c) specifically requires the court to approve the dismissal of all derivative actions, we also find that the court should not limit its review to the committee's investigative procedure and methodologies. The review should extend to the rationale of the committee's decision. However, we stop short of authorizing the reviewing court to substitute its own business judgment for the committee's as the Supreme Court of Delaware did in *Zapata Corp. v. Maldonado.* The court should critically evaluate the committee's findings and recommendations to determine whether they were made in good faith, whether they are supported by the record of the investigation, and whether they are consistent with the corporation's best interests as articulated in the special committee's report.

■■■ The court's review of the adequacy of the committee's investigation should examine (1) the length and scope of the investigation, (2) the committee's use of independent counsel or experts, (3) the corporation's or the defendants' involvement, if any, in the investigation, and (4) the adequacy and reliability of the information supplied to the committee. When considering whether the committee has reached a reasoned and principled decision that is in the corporation's best interests, the court should consider: (1) the likelihood that the plaintiff will succeed on the merits, (2) the possible financial burden on the corporation compared with the litigation costs, (3) the extent to which dismissal will permit the defendants to retain improper benefits, and (4) the effect continuing the litigation will have on the corporation's business reputa-

5. *Houle v. Low* has itself not escaped criticism. *See* John D. Donovan, *Derivative Litigation and* *the Business Judgment Rule in Massachusetts,* Boston B.J., Nov./Dec. 1990, at 22.

tion and good will. *See Houle v. Low*, 556 N.E.2d at 59.

## III.

■ The party seeking dismissal of a derivative suit based on a special litigation committee's recommendation has the burden of satisfying the court of the committee's independence, good faith, and procedural fairness, as well as the soundness of the committee's conclusions and recommendations. *See Houle v. Low*, 556 N.E.2d at 58; 13 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 6019.58 (rev. perm. ed. 1991). Mr. Lewis challenges the committee's independence by questioning (1) both committee members' lack of banking expertise, (2) one member's social relationship with the current bank president, and (3) the other members decision to charge the bank an hourly fee for his services. Whether taken separately or together, these matters are not sufficient to undermine the committee's independence or disinterestedness.

■ The qualifications of the committee members are a legitimate subject of inquiry. *See Alford v. Shaw*, 358 S.E.2d at 328. However, the adequacy of the committee's qualifications depends on the nature of the issues involved, the complexity of the information obtained during the committee's investigation, and the extent the committee obtained expert advice and assistance from others.

■ Both members of the special committee in this case were admittedly not experts in banking law. However, the issues raised in Mr. Lewis' derivative complaint did not require banking sophistication. The state regulatory authorities informed the committee that the transactions questioned by Mr. Lewis were consistent with state and federal banking law and with the memorandum of understanding between the bank and the state and federal regulators. Without being experts themselves, the committee members could reasonably rely on the information and opinions of the regulators concerning the safeness and soundness of the bank's practices.

■ One of the committee members is the minister of the church attended by the bank's president. However, the bank's president is not a defendant in the derivative suit, and the record contains no indication that the president was interested, or even involved, in the transactions criticized in the complaint. Thus, the committee member's long-standing personal relationship with the bank's president is insufficient to call his independence into question.

■ The other committee member is a practicing attorney who had no prior relationship to the bank. He was appointed to the board and to the committee after Mr. Lewis filed the derivative suit. Instead of receiving the usual directors' fee for his services on the board and committee, the member's compensation was based on his normal hourly rate for legal services. Since the amount of the committee member's compensation did not depend upon his conclusions, we do not find that the compensation arrangement calls this committee member's independence into serious question.

■ The record supports the trial court's conclusion that this special litigation committee was independent and disinterested and that their investigation into the transactions criticized by Mr. Lewis was adequate. The committee members' complementary backgrounds enabled them to represent the bank's different constituencies. The committee was large enough to prevent control by the board and was made up of persons who had no interest in the transactions at issue. It also had broad authority to conduct its investigation without interference or direction from the other members of the board.

The investigation proceeded over seventeen months and consumed many hours of the committee's time. The committee received all the information it requested and had access to all the parties involved in the transactions under investigation. There is no evidence that the bank's officers or directors impeded the committee's work in any way. While the committee did not retain experts of its own, one member was an experienced attorney familiar with bank-

ing and corporate matters. In addition, the committee had the benefit of the opinions of the state bank regulators and the special counsel employed by the bank to investigate Mr. Lewis' complaints.

■ The final issue to be decided is whether the special litigation committee's recommendation that Mr. Lewis' suit be dismissed is consistent with the corporation's best interests. Mr. Lewis' complaint is based on technical interpretations of the banking and corporate law. Its viability was greatly undermined by the bank's intervening corrective action in 1988 and by the regulatory authorities' view that the bank was operating appropriately.

There is little likelihood that Mr. Lewis could succeed on the merits if his derivative claims were to go to trial. There is, likewise, no convincing proof that dismissing Mr. Lewis' complaint will permit any of the bank's officers and directors to profit from improper dealings with the bank. Allowing Mr. Lewis' suit to continue will be costly to the bank and could seriously undermine the bank's good will in the community. Accordingly, we have no basis to find that the committee failed to exercise sound business judgment when it determined that Mr. Lewis' derivative complaint should be dismissed.

### IV.

We affirm the dismissal of the complaint and remand the case to the trial court for whatever further proceedings are required. We tax the costs of this appeal to Richard A. Lewis and his surety for which execution, if necessary, may issue.

TODD, P.J., and LEWIS, J., concur.