# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### May 3, 2016 Session

## IN RE PACER INTERNATIONAL, INC.

### Appeal from the Chancery Court for Davidson County
### No. 1439IV   Russell T. Perkins, Chancellor

_____

### No. M2015-00356-COA-R3-CV – Filed June 30, 2017

_____

In this class action, stockholders sued to prevent a proposed merger alleging that the company's board of directors had breached their fiduciary duty.  After expedited discovery, the stockholders agreed to settle in consideration for disclosure of additional information that could affect approval of the merger.  The court preliminarily approved the proposed settlement and ordered the company to notify all potential class members of the proposal.  Only one class member objected to the proposed settlement.  After a fairness hearing, the chancery court approved the settlement and denied the objector's request for access to discovery materials obtained during the litigation.  The objector appeals, arguing that the chancery court erred in denying it access to discovery and in approving the proposed settlement.  Upon review, we conclude that the chancery court did not abuse its discretion.  Accordingly, we affirm.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which RICHARD H. DINKINS and THOMAS R. FRIERSON, II, JJ., joined.

Greg Oakley, Nashville, Tennessee, and James D. Shields and Bart Higgins, Addison, Texas, for the appellant, Black Oak Investments, LLC.

Britt K. Latham and Jamie L. Brown, Nashville, Tennessee, and James P. Smith III and John E. Schreiber, New York, New York, for the appellees, Pacer International, Inc., Daniel W. Avramovich, Dennis A. Chantland, J. Douglass Coates, P. Michael Giftos, Robert J. Grassi, Robert D. Lake, and Robert F. Starzel.

L. Webb Campbell II and John L. Farringer IV, Nashville, Tennessee, and Rachelle Silverberg and A. J. Martinez, New York, New York, for the appellees, Acquisition Sub, Inc., and XPO Logistics, Inc.

Douglas S. Johnston, Jr., Timothy L. Miles, and Scott P. Tift, Nashville, Tennessee, Jerry E. Martin and Christopher M. Wood, Nashville, Tennessee, and Randall J. Baron and David T. Wissbroecker, San Diego, California, for the appellees, Adnan Mahmutagic, Roger Blackwell, Mark Frazier, Michael Iseman, and Joe Weingarten.

## OPINION

### I.

This case began as a challenge to a proposed merger between Pacer International, Inc. and a wholly-owned subsidiary of XPO Logistics, Inc. After Pacer and XPO jointly announced the proposed merger, individual Pacer stockholders filed five class action lawsuits, which were ultimately consolidated into the present case, seeking to enjoin the merger.

The class actions were based on allegations that Pacer's Board of Directors breached its fiduciary duty to the stockholders, and Pacer and XPO aided and abetted the breach.[1] Specifically, Plaintiffs alleged that Pacer's Board breached its fiduciary duty by (1) allowing Pacer's senior management and its financial advisor, Morgan Stanley & Co. LLC, significant involvement in the sales process in spite of alleged conflicts of interest; (2) accepting an inadequate price for Pacer stock; (3) agreeing to unreasonable deal protection measures in the merger agreement; and (4) failing to disclose material information in the proxy statement.[2] Defendants maintained that Pacer's Board fulfilled its duty to the stockholders.

### A. THE MERGER PROCESS

As part of their duties, Pacer's Board periodically evaluated the company's strategic business plan with input from senior management and Morgan Stanley. At the July 2013 board meeting, Morgan Stanley presented the results of a preliminary analysis

---

[1] Plaintiffs sued Pacer, the individual members of Pacer's Board, XPO, and the XPO subsidiary created for the merger, seeking primarily equitable relief: a declaratory judgment that Pacer's Board had breached its fiduciary duty and an injunction preventing consummation of the merger. In the event the merger took place before an injunction was issued, Plaintiffs asked for rescission and appropriate rescissory damages.

[2] Before Pacer's Board could solicit approval of the proposed merger from stockholders, the company was required to send all stockholders a proxy statement with sufficient information to allow them to cast an informed vote. 15 U.S.C.A. § 78n (West, Westlaw through P.L. 115-40); *see generally* 69 Am. Jur. 2d Securities Regulation—Federal §§ 607, 670, Westlaw (database updated May 2017).

of potential strategic alternatives available to the company, which included a sale of the whole business. As part of the analysis, Morgan Stanley, in conjunction with senior management, identified 28 potential buyers that might have interest in acquiring Pacer. Based on the information presented, Pacer's Board agreed that Morgan Stanley could conduct further analysis to ascertain whether the group contained "potential strategic partners for Pacer."

Thereafter, Pacer's Board authorized Morgan Stanley to contact 14 potential buyers.[3] Of the 14 parties approached, 11 expressed preliminary interest. Pacer exchanged limited private information with the interested parties under confidentiality agreements. Ultimately, three parties submitted written, non-binding indications of interest to acquire Pacer. XPO was among the three.

Pacer's Board held a special meeting on October 7, 2013, to discuss the three potential bidders. After discussion, the determination was made to move forward. During a regular board meeting conducted later that month, Morgan Stanley advised Pacer's Board of its prior relationships with each of the potential bidders. After these disclosures, Pacer's Board agreed it would be necessary to engage a second financial advisor to give an additional fairness opinion if XPO became the leading bidder in light of Morgan Stanley's relationship with XPO. In the meantime, representatives of Pacer and the three bidders began conducting due diligence.

From October to November of 2013, the market price of Pacer's common stock increased without explanation from $6.98 to $8.95 per share. XPO became the sole potential bidder when the two others withdrew, citing Pacer's rising stock price as a concern. At a special board meeting in November, Morgan Stanley discussed the possibility that the unexplained increase in the stock price was due to a leak concerning the merger talks.

Apparently unfazed by the rising stock price, XPO offered to purchase Pacer for $9.00 per share, payable in cash and shares of XPO common stock. Pacer's Board discussed XPO's offer and Pacer's other strategic alternatives at two separate meetings in November and December with Morgan Stanley and senior management. At the conclusion of these discussions, Pacer's Board instructed Morgan Stanley to negotiate a more favorable proposal from XPO. Specifically, Pacer's Board requested a higher purchase price, a greater percentage of cash consideration, and changes in other provisions of the proposed merger agreement. Pacer's Board also authorized the retention of a second financial advisor.

_____

[3] Pacer's Board, with input from Morgan Stanley and senior management, narrowed the original group of 28 potential bidders to 14 based on factors such as previous industry investment expertise, perceived ability to recognize the value of Pacer's business, potential synergies, financial capability to complete a transaction, and likelihood of execution.

XPO submitted a revised bid on December 5, 2013. While not increasing the overall purchase price, the revised bid included a different consideration mix and protections related to the value of XPO's stock. Pacer's Board discussed the revised bid and directed Morgan Stanley to continue to seek an increased purchase price from XPO. The Board also directed Morgan Stanley to approach one of the potential bidders that had withdrawn to gauge interest in making an offer in light of a recent decline in Pacer's stock price.[4] At this stage, the Board engaged Houlihan Lokey Financial Advisors, Inc. to provide an additional fairness opinion.

On December 12, 2013, a previously unknown entity, having heard rumors of a merger, contacted Morgan Stanley and expressed interest in "taking a look" at Pacer. Morgan Stanley reported the contact to Pacer's Board. But, based on the advice of Morgan Stanley and Houlihan Lokey, Pacer's Board declined to enter into negotiations with the new potential bidder.

Negotiations between Pacer and XPO resulted in a number of changes to the merger agreement and a firm offer of $9.00 per share, with Pacer stockholders to receive $6.00 in cash and a fraction of a share of XPO common stock equal to $3.00 for each share of Pacer stock. Throughout the month, negotiations on the details of the stock component and potential employment agreements with key members of Pacer management continued.

On January 5, 2014, Pacer's Board met and reviewed the documentation and terms of the proposed merger. Morgan Stanley and Houlihan Lokey advised Pacer's Board that the proposed consideration was fair, from a financial point of view, to stockholders. Pacer's Board unanimously adopted and approved the merger agreement. Both Pacer and XPO executed the merger agreement that same day.

On January 6, 2014, Pacer and XPO announced the proposed merger. The class actions followed within days after the merger announcement. Pacer and XPO filed a proxy statement detailing information about the merger with the Securities and Exchange Commission on January 29, 2014.

## B. THE CLASS ACTIONS

On February 20, 2014, the Chancery Court for Davidson County, Tennessee, appointed lead counsel for Plaintiffs with authority to conduct discovery and settlement negotiations ("Lead Counsel"). The parties negotiated the terms of a protective order and agreed to conduct expedited, limited discovery. Pacer produced internal business documents, and Plaintiffs deposed Pacer's chief executive officer, an outside member of

---

[4] The bidder remained uninterested.

4

Pacer's Board, and a representative of Morgan Stanley. Plaintiffs also retained their own financial consultant to provide another fairness opinion on the proposed merger.

Settlement negotiations began in March. The parties orally agreed to settle if Defendants disclosed additional information about the merger before the stockholder vote. Defendants filed supplemental disclosures with the SEC on March 18, 2014. On March 27, 2014, Pacer stockholders approved the proposed merger, and the merger was consummated on March 31, 2014.

On August 6, 2014, Plaintiffs moved for preliminary approval of the settlement.[5] The court preliminarily approved both the settlement and notice of settlement on October 14, 2014, set December 31 as the deadline for class members to file any objections, and scheduled a fairness hearing for January 15, 2015. Ultimately, 6,306 potential class members were notified of the proposed settlement.

On December 23, 2014, the parties moved for final approval of the proposed settlement. In a sworn declaration filed with the court, Lead Counsel opined that the proposed settlement would be the most beneficial result for the class. Lead Counsel described the discovery and settlement negotiation process and explained the basis for his determination that any claim for monetary compensation lacked significant value. An exculpatory clause in Pacer's charter shielded Pacer's Board from liability for money damages as a result of any breach of the duty of care, and discovery failed to uncover any evidence of a breach of the duty of good faith or loyalty. As a result, settlement negotiations focused on obtaining additional disclosures about the merger process to enable stockholders to make an informed decision about the proposed merger. Lead Counsel also certified that the supplemental disclosures made as part of the settlement were accurate and provided sufficient information for stockholders to cast an informed vote on the proposed merger.[6]

## C. OBJECTION TO THE PROPOSED SETTLEMENT

On December 31, 2014, Black Oak Investments, LLC filed written objections to the proposed settlement and certification of the settlement class. Black Oak owned approximately three percent of Pacer's stock, making it one of Pacer's largest stockholders. Black Oak was the only class member to object to the proposed settlement.

---

[5] The parties executed a written settlement agreement on July 28, 2014.

[6] The supplemental disclosures included additional information about Morgan Stanley's compensation arrangement in connection with the merger, the methodology and financial data used by Morgan Stanley and Houlihan Lokey in their fairness opinions, and the financial projections of senior management.

Black Oak contended that Pacer's Board breached its fiduciary duty to Black Oak "by not entertaining all credible offers to get a bid over XPO Logistic's bid of $9.00 per share." Black Oak also claimed that $9.00 per share was below market value at the time of the transaction and that Black Oak would have paid a higher price per share for Pacer, "if warranted after receiving the necessary information and documents to properly value and evaluate the transaction."

Black Oak requested that the court order the parties to share all discovery materials acquired during the litigation. Without the requested documents, adequate time to review those documents, and "potentially discover[] and develop evidence on its own," Black Oak claimed it would be denied its right to meaningfully participate in the fairness hearing. Nevertheless, Black Oak objected[7] to the lack of monetary compensation for the class and the breadth of the released claims and contended that the settlement was not negotiated at arm's length.

At the fairness hearing, Black Oak argued that the stockholders were releasing a valuable claim for monetary damages without receiving a commensurate benefit. Based on its "extensive industry knowledge," Black Oak claimed that it realized in 2012 that Pacer stock was undervalued. Since Black Oak already owned stock in HIG Capital, a Pacer competitor, Black Oak began to purchase stock in Pacer with an eye toward merging the two companies to further increase shareholder value. Black Oak also claimed that it induced HIG Capital to make an offer to acquire Pacer for $7.50 per share in 2012, which represented a premium over the share price. Pacer's Board, however, rejected the offer and notified HIG Capital that it was not interested in further discussions at that time.

According to Black Oak, Pacer stock was still undervalued in 2013.[8] And it noted that XPO's offer was not significantly higher than the market price. Black Oak argued that Pacer's Board should have realized that HIG Capital would have made a higher offer based on its 2012 bid. Thus, according to Black Oak, the court could assume that Pacer's Board failed to obtain the highest possible price.

---

[7] Black Oak's written objection included a number of additional grounds, including objections to the non-opt out structure of the proposed settlement, certification of the class, and inadequacy of the representative plaintiffs and their counsel. Although Black Oak originally appealed the court's certification of a non-opt-out class, Black Oak's counsel informed the court at oral argument that his client was abandoning that issue.

[8] XPO's stock price increased after the merger, and according to Black Oak, the rise in XPO's stock price indicated the market's perception that Pacer had been acquired at a bargain price.

After a lengthy fairness hearing during which both the settlement proponents and the objector were allowed to present their views, the court issued its memorandum and final order denying Black Oak's objections on January 27, 2015. The court specifically found:

> The Court appointed lead plaintiffs and their counsel at a contested hearing. Plaintiffs' counsel has an established track record in the litigation of merger-related cases. Plaintiffs aggressively prosecuted this case. Black Oak has presented the Court with no basis to conclude that plaintiffs were inadequate representatives.
>
> Instead, Black Oak asserts that the settlement terms themselves somehow show inadequacy of representation. But Black Oak has identified no term of the settlement that deviates from common practice or violates any rule of law. The settlement is fair, reasonable, and adequate.
>
> To begin with, the consideration in this settlement was appropriate and in line with relevant precedent. It consisted of numerous supplemental disclosures that addressed plaintiffs' allegations that defendants failed to disclose adequate information about the merger. Courts routinely recognize that "[i]mproved disclosures may certainly prove beneficial to class members and may constitute consideration of a type which will support a settlement of claims." *In re FLS Holdings, Inc. S'holders Litig.*, [No. CIV.A.12623,]1993 WL 104562, at *5 (Del. Ch. Apr. 2, 1993). And the parties submitted numerous orders entered by Tennessee courts approving settlements of merger cases where, like here, the consideration consists of additional disclosures. *See* Exhibits to Defendants' Memorandum. The consideration here was fair because the settlement gave Pacer's stockholders access to information that they did not have and could not otherwise have obtained to evaluate the transaction.

(internal footnote omitted).

With regard to any potential claim for money damages, the court was satisfied that Lead Counsel adequately investigated any damages claim and determined that such a claim would not be viable under the circumstances. The court concluded:

> In short, Black Oak has provided the Court with no basis in fact or law to second-guess the investigation of the Court-appointed class representatives or their judgment that the settlement provided the class with

substantial consideration in view of the weakness of the claims. There is no basis to reject the settlement, which is fair, reasonable, and adequate.

The court denied Black Oak's request for access to previously discovered materials and to conduct its own discovery into settlement negotiations. The court determined that Black Oak had no right to discovery before it filed its objections and, after filing, was entitled to discovery only if it presented a colorable claim that the settlement should be disapproved. The court denied Black Oak's request for discovery of settlement negotiations because it had not produced any evidence of collusion.

## II.

Black Oak argues that the trial court erred in approving this class action settlement and in denying it access to discovery materials. We review both decisions for an abuse of discretion. *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 625 (6th Cir. 2007); *see also Denver Area Meat Cutters & Emp'rs Pension Plan v. Clayton*, 209 S.W.3d 584, 590 (Tenn. Ct. App. 2006). A court abuses its discretion when it applies an incorrect legal standard, reaches an unreasonable result, or bases its decision on a clearly erroneous assessment of the evidence. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Tennessee Rule of Civil Procedure 23.05 does not specify the legal standard for trial court approval of a class action settlement, and our case law provides scant guidance. Tenn. Civ. P. 23.05 ("A certified class action shall not be voluntarily dismissed or compromised without approval of the court."). We have directed trial courts to consider various factors, such as "the 'risk and likely return to the class of continued litigation', the range of possible outcomes and probability of each, [and] whether class counsel's fees are proportional to the incremental benefits conferred on the class members." *Posey v. Dryvit Sys., Inc.*, No. E2004-02013-COA-R9-CV, 2005 WL 17426, at *2 (Tenn. Ct. App. Jan. 4, 2005) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002)). We have also focused on the level of investigation of the plaintiffs' claims, whether settlement negotiations were at arm's length, the number of objectors, the objectors' access to information, and the experience of the parties' counsel. *In re High Pressure Laminate Antitrust Litig.*, No. M2005-01747-COA-R3-CV, 2006 WL 3681147, at *4-5 (Tenn. Ct. App. Dec. 13, 2006). In the only published Tennessee opinion, we focus on the fairness of the proposed settlement. *Denver Area Meat Cutters & Emp'rs Pension Plan*, 209 S.W.3d at 591. And we indicated that "[t]he most important consideration [in determining whether a settlement is fair] is the strength of plaintiffs' case on the merits weighed against the amount offered in settlement." *Id.* (quoting *In re Agent Orange Product Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984)).

The parties urge us to apply the standard used in federal court for approving class action settlements. *See* Fed. R. Civ. P. 23(e).[9] Under the Federal Rules of Civil Procedure, when a proposed settlement is binding on all class members, the "court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." *Id.* The Sixth Circuit has directed federal district courts to consider several factors when making a fairness determination: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *UAW*, 497 F.3d at 631.

When Tennessee and federal procedural rules are identical, we view case law construing the analogous federal rule as persuasive authority. *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 637 n.2 (Tenn. 1996). But the current federal counterpart to Tennessee Rule 23.05 is markedly different.[10] Even so, our previous opinions have referenced federal case law in evaluating class action settlements. *See Denver Area Meat Cutters & Emp'rs Pension Plan*, 209 S.W.3d at 591 (quoting *In re Agent Orange Product Liab. Litig.*, 597 F. Supp. at 762); *Posey*, WL 17426, at *2 (quoting *Reynolds*, 288 F.3d at 280). Thus, while we may consider federal law, Tennessee's common law must control the outcome of this case. *See Vythoulkas v. Vanderbilt Univ. Hosp.*, 693 S.W.2d 350, 358 (Tenn. Ct. App. 1985), *superseded on other grounds by* Tenn. R. Civ. P. 26.02(4)(B) (explaining that any doubt concerning

---

[9] Federal Rule of Civil Procedure 23(e) provides as follows:

(e)The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23

[10] In 2003, Federal Rule 23(e) was amended "to strengthen the process of reviewing proposed class-action settlements." *See* Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment.

9

"whether federal construction of the Federal Rules of Civil Procedure or Tennessee's common law controls a question of procedure should be resolved in favor of Tennessee's common law."). Therefore, we review the fairness of the settlement in light of the Tennessee common law.

## A. Fairness of Proposed Settlement

Black Oak contends that the settlement was unfair because Plaintiffs did not receive any monetary compensation, the supplemental disclosures did not include all the allegedly omitted information, and Black Oak was not satisfied that the price XPO paid for Pacer stock was adequate. As we address these objections, we bear in mind that "[t]he law favors the settlement of disputes." *First Nat. Bank v. Union Ry. Co.*, 284 S.W. 363, 364 (Tenn. 1926); *accord Denver Area Meat Cutters & Emp'rs Pension Plan*, 209 S.W.3d at 590. A settlement is by its very nature a compromise. *Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 835 (E.D. Mich. 2008). The court must determine, not whether the settlement represents the best outcome, but whether it falls within the "range of reasonableness." *Id.* (quoting *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 596 (E.D. Mich. 2006)).

In evaluating a class action settlement, both Tennessee and federal courts weigh the "'plaintiffs' likelihood of success on the merits against the amount and form of the relief offered in the settlement.'" *UAW*, 497 F.3d at 631 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14, (1981)); *see Denver Area Meat Cutters & Emp'rs Pension Plan*, 209 S.W.3d at 591. This class action is premised on alleged breaches of fiduciary duty by Pacer's Board in connection with the proposed merger of a publicly held company. As such, this case would be relatively complex and expensive to take to trial, involving issues of securities regulation and corporate governance. The court appointed Lead Counsel for Plaintiffs with extensive experience in this type of litigation. In view of the fact that Plaintiffs were seeking to stop the proposed merger, Lead Counsel acted quickly to negotiate an agreed protective order and discover nonpublic documents and key deposition testimony. Lead Counsel reviewed voluminous SEC filings and the results of discovery before determining that any claim for breach of fiduciary duty had no real monetary value.

Plaintiffs had a heavy burden to overcome to succeed on the merits. Tennessee courts are loathe "to substitute their judgment for that of a corporation's board of directors." *Lewis ex rel. Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215, 220 (Tenn. Ct. App. 1992). "[W]e presume that a corporation's directors, when making a business decision, acted on an informed basis, in good faith, and with the honest belief that their decision was in the corporation's best interests." *Id.* at 220-221. Discovery failed to reveal evidence of bad faith or disloyalty, and Plaintiffs could not recover for a breach of the duty of care in light of the exculpatory clause in Pacer's charter. *See* Tenn. Code Ann. § 48-12-102(b)(3) (Supp. 2016).

10

Black Oak argues, however, that once Pacer was "on the auction block," Pacer's Board had one duty: to obtain the best possible price for the stockholders. *See Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 561 (Tenn. 1990). According to Black Oak, the failure to obtain a higher price was a breach of the duty of loyalty. *See Summers v. Cherokee Children & Family Servs., Inc.*, 112 S.W.3d 486, 504 (Tenn. Ct. App. 2002) ("The officers and directors of a for profit corporation are to be guided by their duty to maximize long term profit for the benefit of the corporation and the shareholders.") Even so, Plaintiffs would bear the burden of proving that Pacer's Board could have obtained a higher price.[11] Although Black Oak claims that HIG Capital would have made a higher offer, on this record, that is pure speculation. Pacer's Board accepted the highest offer it received from a qualified bidder. Black Oak's argument merely highlights the evidentiary difficulties facing Plaintiffs in this litigation and is not convincing evidence that Plaintiffs' monetary claims had significant value.

Plaintiffs' remaining claim was that the proxy statement omitted material information. Although Defendants maintained that the proxy statement was not misleading, they agreed to additional disclosures to avoid the expense of proceeding to trial. The chancery court found that these disclosures provided information to the stockholders that was previously unavailable. For instance, the supplemental disclosures provided additional information about the methodology and financial information used by both Morgan Stanley and Houlihan Lokey and the financial projections made by Pacer management in October of 2013. Courts have held that supplemental disclosures can be valuable to stockholders. *See In re Xoom Corp. Stockholder Litig.*, No. CV 11263-VCG, 2016 WL 4146425, at *5 (Del. Ch. Aug. 4, 2016) (holding that the supplemental disclosures "worked a modest benefit on the stockholders").

We find Black Oak's argument that the supplemental disclosures lacked sufficient value because they did not address every alleged omission unavailing. As we stated previously, settlements are the result of compromise. *Leonhardt*, 581 F. Supp. 2d at 835. Thus, it is unsurprising that Plaintiffs settled for less than they requested. *See Gordon v. Verizon Commc'ns, Inc.*, 46 N.Y.S.3d 557, 567 (N.Y. App. Div. 2017) ("It would be speculative, at best, to assume that plaintiff could have obtained any more helpful disclosures from Verizon by proceeding to trial.").

The court's job in weighing the likelihood of Plaintiffs' success is not to pick a winner. "The question rather is whether the parties are using settlement to resolve a

---

[11] Black Oak opined that Pacer stock was undervalued, and Pacer's Board should have demanded an offer that provided a significant premium to stockholders. The settlement proponents countered that, in reality, Pacer stockholders received a premium because the Pacer share price was falsely elevated by merger rumors, and the XPO offer included shares of XPO common stock, which have increased in value since the merger.

legitimate legal and factual disagreement." *UAW*, 497 F.3d at 632. This record lacks evidence of collusion or improper behavior by Plaintiffs or Lead Counsel. *See UAW*, 497 F.3d at 628 (explaining that objectors must produce evidence to overcome the normal presumption that Plaintiffs' counsel "handled their responsibilities with the independent vigor that the adversarial process demands"). While the settlement did not alter the purchase price, the supplemental disclosures did provide value. Lead Counsel admitted at the fairness hearing that, upon discovery, it became clear that Plaintiffs faced substantial obstacles in obtaining a favorable judgment.

We recognize that disclosure-only settlements are disfavored in some courts.[12] But, in this instance, when weighed against the relative weakness of Plaintiffs' claims, we conclude that the additional disclosures provided adequate consideration. *See In re Cox Radio, Inc. Shareholders Litig.*, No. CIV.A. 4461-VCP, 2010 WL 1806616, at *13 (Del. Ch. May 6, 2010), *aff'd*, 9 A.3d 475 (Del. 2010), and *aff'd*, 9 A.3d 475 (Del. 2010) (holding that the modest benefit of supplemental disclosures outweighed the cost of releasing claims without significant value); *In re Dr. Pepper/Seven Up Cos., Inc. Shareholders Litig.*, No. CIVIL ACTION 13109, 1996 WL 74214, at *4 (Del. Ch. Feb. 9, 1996), *aff'd* 683 A.2d 58 (Del. 1996) (approving "meager" settlement when plaintiffs' claims were admittedly weak and supplemental disclosures provided some tangible benefit).

Black Oak was the only objector out of a class of over 6000. The small number of objectors relative to the overall class size is strong evidence of the fairness of the settlement. *In re High Pressure Laminate Antitrust Litig.*, 2006 WL 3681147, at *5. The chancery court found that Lead Counsel sufficiently investigated Plaintiffs' claims and negotiated the settlement at arm's length and in good faith. After considering the objectors' arguments and the documentary evidence, the court determined that the settlement was fair, reasonable, and adequate. We conclude that the court's decision was not an abuse of discretion.

---

[12] Delaware courts have expressed concerns that disclosure-only settlements provide insufficient benefit to stockholders. *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 898 (Del. Ch. 2016) ("To be more specific, practitioners should expect that disclosure settlements are likely to be met with continued disfavor in the future unless the supplemental disclosures address a plainly material misrepresentation or omission, and the subject matter of the proposed release is narrowly circumscribed to encompass nothing more than disclosure claims and fiduciary duty claims concerning the sale process, if the record shows that such claims have been investigated sufficiently."). The Delaware approach has been adopted in at least one other jurisdiction. *See In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 725 (7th Cir. 2016); *but see Roth v. Phoenix Companies, Inc.*, 50 N.Y.S.3d 835, 838 n.4 (N.Y. Sup. Ct. 2017) (explaining that New York has rejected the *Trulia* standard and adopted a "some benefit" approach).

## B. ACCESS TO DISCOVERY MATERIALS

Finally, Black Oak contends that its ability to demonstrate that the settlement was unfair was "greatly diminished" by its lack of access to the discovery obtained by Lead Counsel. Black Oak paints its request in broad strokes, seeking to review any and all documents produced by Pacer, the deposition transcripts, and any information relied on by Plaintiffs' fairness expert, as well as the expert's work product. Black Oak has made little attempt to explain precisely how the requested materials would enhance its ability to present its objections other than a vague claim that the discovery materials might contain information on Pacer's stock value. Defendants objected to revealing competitively sensitive information to an objector who admitted to having an equity interest in a competing entity. We conclude that it was not an abuse of discretion to deny Black Oak access to discovery materials under the circumstances of this case.

As a class member, Black Oak had the right to object to the proposed settlement and to participate in the fairness hearing. *UAW*, 497 F.3d at 635. But the trial court retains "wide latitude" in controlling the nature of an objector's participation. *Id.* Due process is satisfied when an objecting party is allowed to "present evidence and have its objections heard." *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001) (quoting *United States v. City of Hialeah*, 140 F.3d 968, 989 n.12 (11th Cir. 1998)). An objector is not entitled to "dictate to the court the precise manner in which he is to be heard." *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002) (quoting *Jones v. Nuclear Pharm.*, 741 F.2d 322, 325 (10th Cir. 1984)). Thus, the trial court "may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision" and need not endow objecting class members with "the entire panoply of protections afforded by a full-blown trial on the merits." *UAW*, 497 F.3d at 635 (quoting *Tenn. Ass'n of Health Maint. Orgs.*, 262 F.3d at 567).

Objectors are not "automatically entitled to discovery." *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n.6 (6th Cir. 1984). "While the court must extend all objectors fair opportunity to challenge a proposed settlement, this does not translate in all cases into unfettered access to an existing and voluminous discovery record." *Hershey v. ExxonMobil Oil Corp.*, No. 07-1300-JTM, 2012 WL 4758040, at *1 (D. Kan. Oct. 5, 2012). Only if an objector makes "a colorable claim that the settlement should not be approved" will the court consider an objector's request for discovery. *UAW*, 497 F.3d at 635. Because the courts favor settlements, objectors are not entitled to thwart the settlement process without "a clear and specific showing that vital material was ignored" by the trial court. *Id.* (citing *Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986)).

While acknowledging the "colorable claim" standard would apply to a request to conduct its own discovery, Black Oak maintains that it had an absolute right to review all of the materials acquired under the agreed protective order based on the Sixth Circuit's

13

decision in *Cohen v. Young*, 127 F.2d 721, 724 (6th Cir. 1942). Black Oak's reliance on *Cohen* is misplaced.[13] The objector in *Cohen* was not requesting access to discovery materials but was seeking to present evidence at the fairness hearing. *Id.* at 724. The *Cohen* court reaffirmed the trial court's inherent discretionary authority over the presentation of evidence at a fairness hearing but held that it was an abuse of discretion to deny the objector the opportunity to present evidence. *Id.*

We find the remaining authority Black Oak cites equally unpersuasive. Simply because the parties in other class actions chose to share discovery materials with objectors does not create a right to access the requested materials. At best, these authorities suggest a best practice for settlement proponents. *See Hertzberg v. Asia Pulp & Paper Co.*, 197 Fed. Appx 38, 41 (2d Cir. 2006) (holding that the trial court did not abuse its discretion in denying objector additional discovery "in light of the fact that OCM acknowledged . . . having failed to review the documents that had already been produced."); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 325 (3d Cir. 1998) (holding the district court did not abuse its discretion in denying additional discovery when the objector "had ample opportunity to avail himself of the substantial discovery provided to Lead Counsel but failed to do so, and that additional discovery was unnecessary because [objector] focused primarily on legal issues."); *see also* Manual for Complex Litigation (Fourth) § 21.643 (2004) ("Parties to the settlement agreement *should generally* provide access to discovery produced during the litigation phases of the class action (if any) as a means of facilitating appraisal of the strengths of the class positions on the merits." (emphasis added)).

This is not a case in which Black Oak lacked sufficient information[14] to determine whether it had any objections to the settlement. To the contrary, Black Oak filed detailed objections to the settlement and the class certification. At the fairness hearing, the court allowed Black Oak to present all of its objections, including the basis of its theory that the price XPO paid for the Pacer stock was too low, and respond to every argument presented by the settlement proponents.

To access the confidential discovery materials obtained by Lead Counsel over the objections of Defendants, Black Oak had to present a colorable claim. The need to be

---

[13] In spite of the fact that the objector was ready to proceed, the trial court "approved the compromise upon the sole ground that it was recommended by the attorneys of record." *Cohen*, 127 F.2d at 724. The Sixth Circuit held that the trial court had improperly ceded its responsibility to the attorneys for the parties. *Id.* at 726. Judicial discretion required the trial court to determine whether the proposed settlement was fair, reasonable, and adequate, not the attorneys. *Id.*

[14] Black Oak had access to all materials in the court record including the settlement agreement, the proxy statement, the supplemental disclosures, and the sworn declaration of Lead Counsel. The proxy statement included the merger agreement, the fairness opinions provided by Morgan Stanley and Houlihan Lokey, and the financial projections of Pacer's senior management.

personally assured that the settlement was reasonable is an insufficient reason. *Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 70-71 (S.D.N.Y. 1976), *aff'd* 556 F.2d 682 (2d Cir. 1977). Otherwise, "no class action would ever be settled, so long as there was at least a single lawyer around who would like to replace counsel for the class and start the case anew." *Geier*, 801 F.2d at 809 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 449 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)).

Here, the settlement proponents submitted ample evidence to enable the court to evaluate the proposed settlement, including the process Pacer's Board followed to obtain the best offer for the company and the criteria used to narrow the field of potential bidders. A significant amount of financial data, such as the financial projections from senior management and the values used by the two financial consultants in their fairness opinions, was also provided. Lead Counsel, who had extensive experience in merger-related litigation, provided the court with the basis for his conclusion that Plaintiffs' claims had no significant monetary value and that the supplemental disclosures benefited the class. All sides submitted voluminous legal memoranda and were allowed to argue their positions at length. On this record, we cannot say that the chancery court ignored vital information in approving this settlement.

## III.

For the foregoing reasons, we affirm the chancery court decision approving the class action settlement and denying the objector access to discovery materials.

_____
W. NEAL MCBRAYER, JUDGE

15